**HEITMEYER v. FEDERAL COMMUNICA-
TIONS COMMISSION.**

, No. 6762.

United States Court of Appeals for the District of Columbia.

Decided Dec. 27, 1937.

Clarence C. Dill, and James W. Gum, both of Washington, D. C., for appellant.

Hampson Gary, George B. Porter, Fanney Neyman, Frank U. Fletcher, and Ralph L. Walker, all of Washington, D. C., for appellee.

Before ROBB, GRONER, and MILLER, Associate Justices, and WHEAT, District Judge.

MILLER, Associate Justice.

This is an appeal under section 402(b)(1) of the Communications Act of 1934[1] from a decision of the Federal Communications Commission denying the appellant's application for a permit to construct a new radio broadcasting station at Cheyenne, Wyo.

The record shows that the Examiner who heard the case made findings of fact and arrived at conclusions therefrom to the effect that:

"The applicant is legally, technically, financially and otherwise qualified to construct and operate the proposed station. A need for additional service such as proposed by the applicant does exist in the area proposed to be served, and this application may be granted within the purview of section 307 of the Communications Act of 1934, 47 U.S.C.A. § 307, and the Regulations of the Commission with regard to quota, particularly Rule 6(f).

---

[1] Act of June 19, 1934, c. 652, 48 Stat. 1064, 1093, 47 U.S.C.A. § 402(b)(1).

"The record is silent as to any possible interference with other applications that may be pending from the same state or zone.

"The site at which the applicant proposes to construct and operate the station will conform to the Rules and Regulations of the Commission.

"The granting of this application would serve public interest, convenience and necessity."

The Examiner, therefore, recommended that the application of Heitmeyer, the appellant herein, be granted. At the same time he recommended denial of the application of the Wyoming Radio Educational Association, which he had theretofore consolidated for hearing with the appellant's application.

Approximately four months later, on May 1, 1936, the Commission entered its final order denying the application; making no findings and assigning no reasons therefor, but stating that it would "issue and publish at a subsequent date an opinion setting forth a statement of the facts appearing of record and the grounds for the decision [t] herein reached." On June 12, 1936, the Commission's decision was entered denying the applications of appellant Heitmeyer and that of the Wyoming Radio Educational Association. The latter applicant has not appealed from the decision of the Commission and is not concerned herein.

Section 402(c) of the Communications Act, 47 U.S.C.A. § 402(c), provides that within thirty days after the filing of an appeal "the Commission shall file with the court the originals or certified copies of all papers and evidence presented to it upon the application or order involved, and also a like copy of its decision thereon, and shall *within thirty days thereafter file a full statement in writing of the facts and grounds for its decision as found and given by it.*" (Italics supplied.)

■ The language of the section quoted is ambiguous. The phrase, "within thirty days thereafter," indicates the intention of Congress that in case of appeal the Commission shall have additional time, totaling sixty days from the filing of the appeal, within which to prepare and file "a full statement in writing of the facts and grounds for its decision." The language immediately following, "as found and given by it," is susceptible of the interpretation that findings of fact should have been

prepared prior to, or simultaneously with, the entry of its decision. Such an interpretation, however, would defeat the very purpose of Congress in allowing the additional thirty days—unless we are prepared to hold that the "full statement in writing of the facts" means something more than findings of fact. Such a holding would be without meaning because on appeal this court will have before it the full record of the evidence. A statement greater in detail than findings, and less in detail than the record itself, would serve no useful purpose. In order to reconcile the two quoted phrases, therefore, and to secure harmony and consistency in the requirements of the statute, it is necessary to interpret the language, "found and given by it," as requiring the Commission to publish something less than findings of fact previous to or coincident with the entry of the decision. This can be accomplished by requiring it to file with its decision the grounds therefor and "a brief factual statement of the reasons" relied upon. As we said in Missouri Broadcasting Corporation v. Federal Communications Commission, 68 App.D.C. 154, 94 F.2d 623, decided December 6, 1937:

"The exact language is—file a full statement in writing of the facts and grounds for its decision *as found and given by it.* The six words we have italicized imply, we think, that the grounds of decision and a brief factual statement of the reasons therefor have been previously given, that is, previously to the filing of the full statement, i. e., findings of fact, in this court."

■ This reasoning brings us to the further definite conclusion that Congress intended the "full statement in writing of the facts * * * found * * * by it," which the Commission is required to file within sixty days after the filing of the appeal, to be of the same general form and character as findings of fact well known to trial courts. The words are properly susceptible of no other meaning. Moreover, there is no reason to suppose that Congress intended to establish a different rule of procedure, in this respect, for the Communications Commission than for other similar governmental boards and commissions which are engaged in quasi-judicial determinations. Beaumont, S. L. & W. Ry. Co. v. United States, 282 U.S. 74, 86, 51 S.Ct. 1, 5, 75 L.Ed. 221; see also, Virginian Ry. Co. v. United States, 272 U.S. 658, 674, 47 S.Ct. 222, 228, 71 L.Ed. 463. This conclusion is borne out also by the

language of section 402(e), 47 U.S.C.A. § 402(e), which limits review of decisions of the Commission to questions of law and then provides that *"findings of fact* by the Commission, if supported by substantial evidence, shall be conclusive unless it shall clearly appear that the findings of the Commission are arbitrary or capricious." (Italics supplied.)

The questions which we must decide then, are: (1) Did the Commission make findings of fact? (2) If so, were they supported by substantial evidence? (3) Were they arbitrary or capricious? (4) Do they support the conclusions of law reached by the Commission in its decision?

▮ We find nothing in the record, or its index, which bears the title "Findings of Fact." We do find a "Statement of Facts and Grounds for Decision." For convenience, this "Statement" is set out—in so far as it is pertinent to this appeal—as follows:

"Statement of Facts and Grounds
for Decision

"* * * This proceeding arose upon the applications of Paul R. Heitmeyer for a construction permit to erect a new broadcast station at Cheyenne, Wyoming, to operate on the frequency of 1210 kc, with power of 100 watts, 250 watts local sunset, unlimited hours of operation; and of Wyoming Radio Educational Association for a construction permit to erect a new broadcast station at Cheyenne, Wyoming, to operate on the frequency of 630 kc, with power of 500 watts, 1 kw local sunset, unlimited hours of operation.

"The Commission was unable to determine from an examination of the applications that the granting thereof would serve public interest, convenience and necessity, and designated the same for public hearing, pursuant to Section 309(a) of the Communications Act of 1934, 47 U.S.C.A. §. 309(a), before an examiner appointed by the Commission. Notice of time and place of hearing was given the applicant and other interested parties. Pursuant to said notice, the application was heard before an examiner on October 30, 1935. * * *

"Cheyenne, Wyoming, is the capital of the State, and is situated near the southeast corner thereof. The population is 17,361 (census of 1930), and Fort Warren, an Army post situated just outside the city, has an estimated population of 4,000. There are approximately 275 retail stores in the city, which did an estimated total volume of business of approximately seven million dollars in 1933. A number of jobbing establishments are located in the city, and railroad shops employ a considerable number of men. The surrounding territory is devoted principally to stock raising, and in some sections farming is engaged in.

"With Respect to the Application of
Paul R. Heitmeyer

"Paul R. Heitmeyer, applicant herein, testified that he is an American citizen by birth, and is therefore legally qualified to be a licensee. It appears that he has been actively engaged in various capacities in radio broadcasting for about fifteen years, and he is at present employed as Manager for Broadcast Station KLO at Ogden, Utah. The Commission is of the opinion that the applicant is technically qualified.

*"With respect to the financial qualifications of the applicant, he testified in the hearing on October 29, 1935, in the matter of his application for the Salt Lake City, Utah, station, the record of which was by stipulation incorporated into this record, that he estimated his financial worth to be $2,500.00. However, on July 15, 1935, he filed a sworn statement, as a part of this application, showing assets of $7,271, with liabilities of $474. Mr. Heitmeyer testified that a deposit had been placed to his credit by Mr. A. L. Glasman, who, it appears, is publisher of the Ogden Standard Examiner, and who also owned the controlling interest in Interstate Broadcasting Corporation, licensee of Station KLO at Ogden, Utah. The deposit was made by Mr. Glasman as a loan to Mr. Heitmeyer for the construction and operation of two broadcast stations, namely, the proposed station applied for herein, and another station at Salt Lake City, Utah. (Docket 2980).*

*"The record discloses further that the applicant intends, in the event this application, and the one for a construction permit for the station at Salt Lake City, Utah, are granted, to form a corporation for each station and request the consent of the Commission to assign the licenses of said stations to the corporations. Under the terms of the agreement between Mr. Glasman and Mr. Heitmeyer by which the loan was made, Mr. Heitmeyer agreed to pay 6% interest on the principal, and to repay the loan within five years. However, in the event the*

loan is not paid under those terms, Mr. Heitmeyer is obligated to assign to Mr. Glasman 49% of the stock of the proposed licensee corporations. It also appears that the estimated cost of constructing the proposed station is $8,890, and the estimated monthly operating expenses are $1,525. The record is silent as to the estimated monthly revenue expected from the proposed station. Mr. Heitmeyer testified that he intends to reside in Salt Lake City, Utah, and leave the management of the requested station in Cheyenne to an employee and that he will visit the station ten or twelve days per month. He further testified that he had interviewed various residents of Cheyenne and found the sentiment favorable to having a radio station in that city, except that the publishers of the two newspapers very definitely objected to the proposed station.

"Upon the record before us, it is clear that the applicant personally is not financially able to construct and operate the proposed station, and that he intends to construct and operate the same, if permitted so to do, entirely on money which he has borrowed, without security, unless it be considered that the requirements for the formation of a new corporation, to whom assignment will be requested, and distribution of 49% of the stock to Mr. Glasman, is security for the loan. If it be so considered, then it is clear that the applicant has failed to show that he is financially qualified to construct and maintain a station of the kind and class applied for, since the loan is conditioned upon approval by the Commission of two applications when filed for assignment of license, which would in effect be a prejudging of those applications, which are not now before the Commission. Manifestly, the Commission is without power under the Communications Act of 1934 to act upon applications not presently before them, nor is it within the spirit of the Act to grant an application when it is apparent that the financial structure is dependent, not upon the applicant, but upon some future unpredictable happening. If it be considered that this stock is not security for the loan, then it is apparent that the applicant has made no sufficient showing of financial responsibility, since the physical equipment of this station may become subject to lien, foreclosure, and seizure by the lender, as a matter of law, in the event the loan is not repaid within the five year period. On the record before

us, the applicant must pay back $20,000, with interest at 6%, in five years, or something over $4,000 per year. The Commission is of the opinion, and so found, that the applicant has not made such a showing of his financial responsibility as would justify the Commission in granting the application applied for. * * *

"The applicants, Paul R. Heitmeyer and Wyoming Radio Educational Association, both introduced considerable testimony relative to the need for a broadcast station in Cheyenne; the talent available there; and other matters, all of which has been carefully considered by the Commission, but as the showing made by both applicants precludes a grant of either application in any event, it is deemed unnecessary to discuss in detail such showing herein.

"After careful consideration of the applications, the evidence adduced at the hearings, the Examiner's Report and the exceptions thereto, and the oral argument, the Commission was of the opinion, and so found, that the public interest, convenience and necessity would not be served by granting the applications. Accordingly, on May 1, 1936, the Commission entered its final order denying the applications of Paul R. Heitmeyer and Wyoming Radio Educational Association, effective at 3 A. M., E. S. T., September 29, 1936. The effective date of this order was later advanced to June 12, 1936." (Italics supplied.)

When we analyze this "Statement," we find, first, a history of the case; then a finding concerning Cheyenne, Wyo., and surrounding territory; then a narrative recital of testimony given by appellant Heitmeyer, and his conclusion that he is legally qualified; then a tentative finding— "it appears that"—concerning Heitmeyer's past and present experience, followed by the Commission's conclusion that he is technically qualified; then three paragraphs concerning Heitmeyer's financial qualifications; then a paragraph in which the Commission states that it is unnecessary to discuss in detail the testimony relative to the need for a broadcasting station in Cheyenne and the talent available there, because "the showing made by both applicants precludes a grant of either application in any event." Finally, there is a paragraph in which the Commission sets out its conclusion that the public interest, convenience, and necessity would not be served by granting the applications.

It is to be noted, at this point, that the Commission has narrowed the case down to one question, i. e., Was the applicant financially qualified? Our inquiries, therefore, are similarly narrowed to a consideration of the three italicized paragraphs of the "Statement." Upon them the Commission's decision must stand or fall. Do they contain findings of fact, and, if so, are such findings supported by substantial evidence? Generally speaking, the three paragraphs consist of a more or less indiscriminate commingling of arguments, speculations, statements of fact, narrative recitals of testimony, and conclusions of law. Taken as a whole, they cannot be said to constitute findings of fact such as are contemplated by the statute. Necessarily, therefore, they provide a highly unsatisfactory basis for appeal and thus defeat the purpose of the statute; which is to inform the parties and this court of the reasons for the Commission's action, with that high degree of certainty which may properly be expected from a group of administrative experts such as constitute the Communications Commission. Boss et al. v. Hardee, 68 App.D.C. 75, 93 F.2d 234, decided September 20, 1937.

It is possible to segregate some sentences in these three italicized paragraphs which, standing alone, and perhaps taken out of context, may be regarded as findings. It is possible, also, to spell out tentative or qualified findings from other sentences. Thus, the first sentence of the first italicized paragraph relates that Hietmeyer estimated his financial worth to be $2500. The next sentence states that, however, he filed a sworn statement showing assets of $7271, with liabilities of $474. The implication seems to be that there is a conflict in his testimony. Such a result cannot fairly be reached from the record. San Diego Land & Town Co. v. Jasper, 189 U.S. 439, 442, 23 S.Ct. 571, 47 L.Ed. 892. The $2500 about which Heitmeyer testified consisted of money in bank, an automobile, home furnishings, and personal effects. In addition he owned $4000 worth of shares—fully paid for—in the corporation which operated Station KLO in Ogden, Utah. Moreover, the evidence at the hearing disclosed that the liabilities of $474 had been fully paid at that time. There was no conflict on this point and, if the two sentences referred to constitute a finding, the only part of it which is supported by the evidence is that Heitmeyer showed assets of $7271. The last two sentences in the first italicized paragraph are supported by the evidence and the testimony there referred to could properly have been formulated into a finding.

The first three sentences in the second italicized paragraph, standing alone, constitute a finding which is supported by substantial evidence. The next sentence, relating to the cost of constructing and operating the proposed station, is supported by the evidence. A careful reading of the record shows that the next sentence, "The record is silent as to the estimated monthly revenue expected from the proposed station," is wholly unsupported by the record. Indeed, the Commission, in its brief, in reviewing the testimony of the witness Haller, quoted therefrom as follows: "A number of the Cheyenne merchants agreed to use time on the proposed station." The brief then states that "on the basis of such a survey the witness estimated that the merchants with whom he talked 'would probably spend within the neighborhood of $2,100 a month.'" In view of the fact that the Examiner made a correct finding upon the point—among other well prepared findings—the Commission's finding cannot be regarded as other than arbitrary and capricious. While the Commission is not bound by the findings of the Examiner, it is itself charged with the responsibility of making findings. Radio Commission v. Nelson Bros. Co., 289 U.S. 266, 285, 53 S. Ct. 627, 636, 77 L.Ed. 1166; St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 53, 56 S.Ct. 720, 726, 80 L.Ed. 1033. In this case it would have profited from a more careful consideration of those which the Examiner prepared.

The last two sentences in the second italicized paragraph are supported by substantial evidence so far as they go, and could properly have been formulated into a finding of fact. The vice of the first sentence, however, is its incompleteness, which gives a shading of meaning not supported by the evidence. The evidence upon this point showed—and a finding might properly have been made accordingly—that Heitmeyer is the supervising director and manager of Station KLO at Ogden, Utah. His salary therefor is $300 per month and will continue, even though he secures the Cheyenne station and devotes approximately ten to twelve days a month to that station, as he expects to do. He has a contract with Mr. Glasman, the controlling stockholder in KLO, so providing and permitting him to engage in any other radio

activities, provided he continues to keep KLO financially successful. If and when the permit and license are granted for the Cheyenne station, he will have a resident manager for that station working under his direction.

The third of the three italicized paragraphs contains one sentence which, standing alone, constitutes a finding, as follows: "On the record before us, the applicant must pay back $20,000, with interest at 6%, in five years, or something over $4,000 per year." This statement, except for the last six words, is supported by the evidence and is covered in part in the preceding paragraph. The last six words constitute a conclusion which is supported by no evidence whatever. There is nothing in the record to prove that Heitmeyer was *required* to pay anything, principal or interest, before the expiration of five years.

Otherwise, the third paragraph is devoid of anything resembling findings except (1) the first sentence, which is so involved with, and dependent upon, a question of law as to be in substance and effect a decision of the latter (Kansas City So. Ry. Co. v. Albers Comm. Co., 223 U.S. 573, 591, 32 S:Ct. 316, 56 L.Ed. 556); and (2) the last sentence, which states the bald conclusion: "The Commission·is of the opinion, and so found, that the applicant has not made such a showing of his financial responsibility as would justify the Commission in granting the application applied for." General statements of this kind, following the language of the statute, are not sufficient to constitute findings of fact such as are contemplated by the statute. Florida v. United States, 282 U.S. 194, 213, 51 S.Ct. 119, 124, 75 L.Ed. 291. The language used indicates that this was intended to be the "brief factual statement of the reasons" for the decision contemplated by the statute, given previously to the filing of the findings of fact. See Missouri Broadcasting Corporation v. Federal Communications Commission, supra. It serves that purpose very well, but does not constitute a finding of fact.

Assuming, for the purposes of this case only, that the three italicized paragraphs constitute findings, we conclude, in answer to our second and third questions, that some of them are supported by substantial evidence, some are not, and some are arbitrary and capricious. Our final question, then, is whether those findings which are supported by substantial evidence, themselves support the conclusions

of law and the decision of the Commission. Otherwise stated, the final question is whether those findings support the conclusion that the applicant was not financially qualified to construct and operate the proposed station.

The argument set forth in the third italicized paragraph shows that the Commission decided the case upon the finding contained in the first three sentences of the second italicized paragraph. This is the only valid finding which could support the decision. It is first contended by the Commission that the·appellant "intends to construct and operate the same [station] * * * *entirely* on money which he has borrowed." The finding does not support that contention. It shows instead that appellant had some assets in addition to the borrowed money. Moreover, there is nothing in any of the valid findings which negatives the intent of the applicant to apply revenue from the station toward cost of operation. However, it does clearly appear that he had *insufficient* money to construct the station without that which he borrowed.

It is next contended by the Commission, as one of two alternative propositions, that appellant has failed to show his financial qualification, because (1) the loan is intended to be secured by the distribution to Glasman of 49 per cent. of the stock of a proposed corporation; (2) the value of the corporate stock depends on the granting of permission for transfer of the station license to the corporation; (3) this involves in effect the prejudging by the Commission of two applications not yet before it; (4) hence the security for the loan is conditioned on a judgment of the Commission which it is powerless to make. If this contention means that the policy of the Commission is to refuse an application—in all other respects satisfactory—merely because an applicant honestly contemplates the formation of a corporation—in the event his application is granted—to which he will transfer the permit and license, with the consent of the Commission, it would seem to verge closely upon arbitrary and capricious action. It would seem to be a rather idle and expensive gesture to require the formation of a corporation for such a purpose before the securing of a construction permit, when a refusal to grant the permit would automatically abort the whole occasion and purpose of the corporation. It would seem on its face to be a rather severe restriction upon business

enterprise and an unnecessary limitation upon the availability of radio service in a particular community. Moreover, it would seem to be a particularly arbitrary and futile procedure in a case such as this, where the applicant fully and fairly revealed his plans. Ordinarily, there would be nothing to prevent an applicant from securing a construction permit and a station license; thereafter forming a corporation; and then requesting permission to make the assignment. Should a penalty be placed upon one who has the foresight to plan his project in advance and reveal its full details? If the applicant is confident that he can make such a showing as to secure the Commission's approval of a subsequent transfer, should the Commission object? In fact, should not the Commission invite just such a revelation of plans so that it can have that contingency in mind when passing on the application for a construction permit, rather than drive the applicant to conceal his plans until after the construction permit has been granted? However, we are not required to decide this question because the first alternative contention of the Commission is not supported by the findings. So far as relevant to this point they read as follows:

" * * * Mr. Heitmeyer agreed to pay 6% interest on the principal, and to repay the loan within five years. *However, in the event the loan is not paid under those terms,* Mr. Heitmeyer is obligated to assign to Mr. Glasman 49% of the stock of the proposed licensee corporation(s)." (Italics supplied.)

It is obvious from the language used in the finding that the assignment of corporate stock by way of security was not contemplated unless and until Heitmeyer had made default in his obligation to repay the loan *within five years.* Heitmeyer insisted throughout his testimony that such was the intention of Glasman and himself, and the Commission found accordingly.

It is apparent that the Commission recognized the invalidity of the above contention because it went on to state a second alternative as follows: The appellant intends to use such borrowed money without giving security therefor; hence he has failed to show sufficient financial responsibility "since the physical equipment of this station may become subject to lien, foreclosure, and seizure by the lender, as a matter of law, in the event the loan is not repaid within the five year period." Assuming that the loan should not

be repaid at the end of five years, it may well be that foreclosure and seizure might result. Does this possibility support the contention that appellant has thus failed to show his financial qualification? The question, otherwise stated, is whether an application such as Heitmeyer's may be properly denied because the applicant proposes to use borrowed money for the purpose of construction and operation, unless the money borrowed is covered by sufficient collateral or other security to insure the station against lien, foreclosure, and seizure for a longer period than five years. Can such a standard be upheld?

In answering this question, we look first for some measure of financial qualification to guide us. We are referred to no rule or regulation of the Commission suggesting such a rigid standard. On such an important question we think the public is entitled to have the statute implemented by a regulation setting out clearly and concisely just what the Commission regards as a minimum standard of financial ability. Evidently Congress had the same intent because the statute provides that all "applications shall set forth such facts as the Commission *by regulation may prescribe* as to * * * *financial, technical, and other qualifications"* of the applicant. Section 308(b), 47 U.S.C.A. § 308(b). (Italics supplied.)

In the absence of such a guide, the appellant suggests that we look to the practice of the Commission in previous cases as set forth in his brief, although not revealed in the record. We are asked to do this on the theory that the Commission "has not refused to grant construction permits for new stations to those who are qualified and experienced in the operation and management of radio stations simply because they did not have abundant personal finances without borrowing to construct and carry on the operation of the proposed stations." Whether or not the Commission has in the past granted licenses under similar circumstances is immaterial. It is fully authorized to increase, by regulation, the requirements previously imposed if the public interest requires. Section 303(f), 47 U.S.C.A. § 303(f). However, in the absence of a regulation, a common sense view of prevalent business methods would seem to justify the use of such borrowed funds for the purpose, unless some circumstance, special to the radio broadcasting industry, distinguishes it from others.

It is true, as suggested in argument, that Congress has imposed heavy obligations upon the Commission to discover and prevent any alien, criminal, or other improper control of radio broadcasting stations, and to guarantee so far as possible an independent, wholesome policy in management and operation. See sections 303, 308(b), 310(a), 311, 313, 47 U.S.C.A. §§ 303, 308(b), 310(a), 311, 313. To the same general end the act gives to the Commission control of assignments and transfers of construction permits, [319(b), 47 U.S.C.A. § 319(b)]; station licenses, section 309(b) (2), 47 U.S.C.A. § 309(b) (2); and of all rights thereunder, whether such assignments or transfers be voluntary or involuntary, direct or indirect, 310(b), 47 U.S.C.A. § 310(b).

It is well known that one of the most powerful and effective methods of control of any business, organization, or institution, and one of the most potent causes of involuntary assignment of its interests, is the control of its finances. By establishing a high enough standard of financial qualification, the Commission can eliminate many of the hazards of such control, direct or indirect in character. It is in the public interest that it should not be impeded in a reasonable exercise of its discretion. The public interest in this respect far outweighs the private interest of any individual applicant. Reading Broadcasting Co. v. Federal Radio Commission, 60 App.D.C. 89, 48 F.2d 458. Perhaps under some circumstances the Commission might be justified in insisting upon the complete financial independence of an applicant.

In any event, the burden is and should be upon the applicant to satisfy the Commission, not only that he has financial ability to construct and operate a station, but financial ability to construct and operate it free of control, direct or indirect, by any person within the classes proscribed by the statute. Beebe v. Federal Radio Commission, 61 App.D.C. 273, 61 F.2d 914. See Campbell v. Galeno Chemical Co., 281 U.S. 599, 609, 50 S.Ct. 412, 415, 74 L.Ed. 1063.

If, then, it appears from the application, or upon the hearing, that the applicant's financial condition is such that there is a probability that he may lose control of the station or that there may be either a voluntary or an involuntary transfer of his rights in relation thereto, a situation may arise in which the Commission will be called upon to enforce the provisions of the sections to which reference has just been made. Sproul v. Federal Radio Commission, 60 App.D.C. 333, 54 F.2d 444. Under such circumstances, it may be wiser from an administrative point of view to avoid such a contingency by insisting upon the removal of the probability before a permit is granted. If so, it is not our place to question the wisdom of the provisions, or to determine whether the Commission's administrative determination was the wisest under the circumstances. Federal Radio Commission v. Nelson Bros. Co., 289 U.S. 266, 277, 53 S.Ct. 627, 633, 77 L.Ed. 1166.

In support of the position taken by the Commission in this case, it can be argued that neither in his original application nor in his financial statement did Heitmeyer reveal his relationship to Glasman. Moreover, it was disclosed at the hearing that Heitmeyer was an employee of Glasman and that he expected to maintain that relationship if and when he should operate the proposed station at Cheyenne. This all lends color to the suggestion made on cross-examination that Heitmeyer was the personal representative of Glasman, or that Glasman was an undisclosed partner and that, in his application and his financial statement, Heitmeyer deliberately avoided revealing Glasman's possible interest in the proposed station.

However, the Commission made no such findings, nor any findings which would support such conclusions. Moreover, the rejection of the application is not placed on any such ground. Again, even if these facts had been found they would not have shown lack of financial qualification per se, but merely possible danger of improper control, *if* the lender happened to be within one of the classes proscribed by Congress.

No matter how good that reason may be generally for excessive caution on the part of the Commission, it loses its force in this case because the lender of the money was himself the owner of a controlling interest in a licensee corporation, and had presumably satisfied all of the exacting requirements of the Commission. If he was acceptable as a licensee, how could it be argued that the applicant who borrowed from him would, as a result thereof, be directly or indirectly controlled by any one— person, government, or corporation—within the proscription? If such reasoning weighed in the rejection of the application,

then the Commission based its decision upon facts and circumstances which do not appear in its findings, and which should not have been considered. Interstate Commerce Commission v. Northern Pacific Ry. Co., 216 U.S. 538, 544, 545, 30 S.Ct. 417, 54 L.Ed. 608.

Therefore, in the absence of a showing that the applicant failed to comply with any regulation setting minimum standards of financial qualification; in view of the fact that the source of the applicant's money and his relationship to the lender were fully revealed at the hearing; and in view of the fact that the lender was himself a licensee of the Commission, the argument which we have assumed in support of the Commission's decision falls of its own weight. If the loan was bona fide, and there is no finding and no evidence to the contrary, it would seem to stand in the same position as any other legitimate plan of financing.

The question then is whether the regulation imposed—by implication at least—in this case was a reasonable one. The Commission argues that the money which the applicant had in bank was unsecured by collateral and hence the lender might satisfy the obligation by taking over the station. What then would be considered safe? Collateral securing a loan might fail, as much of it did during the recent depression; money in bank, belonging entirely to an applicant might be lost by reason of a bank failure; cash in hand or in a safety deposit box might be stolen. We cannot require the impossible in attempting to guarantee safety. The people of the State of Wyoming, and of its capital, Cheyenne, are entitled to radio facilities if there be an applicant available and ready to supply them who can satisfy usual and ordinary standards of business safety. In this period of economic uncertainty, financing reasonably assured five years in advance would seem to constitute much more than the average of business security. If the standard of financial responsibility required by the Commission in this case were imposed upon the country generally, business would cease. Under the circumstances, can it be said that the action of the Commission was anything but arbitrary, if not capricious? We think not; es-

pecially as its own findings were insufficient to support its conclusions of law and the decision based thereon. Florida v. United States, 282 U.S. 194, 212–215, 51 S.Ct. 119, 124, 75 L.Ed. 291.

The discretion which the Commission is directed to exercise is not absolute. The purpose of the statute is to secure to the people of the several states and communities a fair, efficient and equitable distribution of radio service. The Commission is directed by the statute to apply this standard in considering applications for licenses "when and insofar as there is demand for the same" (section 307(b), as amended in 1936, 47 U.S.C.A. § 307(b); and, "if public convenience, interest, or necessity will be served thereby, subject to the limitations of this Act [chapter] shall grant to any applicant therefor a station license." Section 307(a), 47 U.S. C.A. § 307(a).

Proper administration of the law by governmental agencies such as the Communications Commission requires careful observance of the procedures established by Congress. For the protection of the people generally, to say nothing of the agencies themselves, convenience of administration cannot be permitted to justify noncompliance with the law, or the substitution of fiat for adjudication. Interstate Commerce Commission v. Northern Pacific Ry., supra; American Sumatra Tobacco Co. v. Securities and Exchange Commission, 68 App.D.C. 77, 93 F.2d 236, decided September 30, 1937.

The decision, therefore, will be reversed and the case remanded to the Commission with instructions to proceed with the application in conformity with this opinion. This does not mean that it is directed to issue a permit to the appellant. It is not the function of this court "to revise the action of the Commission from an administrative standpoint and to make an administrative judgment. * * * the Commission in its further action is to respect and follow the * * * determination of the questions of law" by this court. Federal Radio Commission v. Nelson Bros. Co., 289 U.S. 266, 276, 278, 53 S.Ct. 627, 633, 77 L.Ed. 1166.

Reversed and remanded.