## AMERICAN BROADCASTING CO., Inc. v. FEDERAL COMMUNICATIONS COMMISSION et al.

Nos. 10496, 10570.

United States Court of Appeals District of Columbia Circuit.

Argued June 26, 1951.

Decided July 19, 1951.

---

James A. McKenna, Jr., Washington, D. C., with whom Andrew G. Haley and Vernon L. Wilkinson, Washington, D. C., were on the brief, for appellant.

Max Goldman, Asst. Gen. Counsel, Federal Communications Commission, Washington, D. C., with whom Benedict P. Cottone, Gen. Counsel, Federal Communications Commission, and Richard A. Solomon and Mary Jane Morris, Attys., Federal Communications Commission, Washington, D. C., were on the brief, for appellee. Dee W. Pincock, Washington, D. C., also entered an appearance for appellee in No. 10570.

W. Theodore Pierson, Washington, D. C., with whom Vernon C. Kohlhaas, Washington, D. C., was on the brief, for intervenor.

Thomas N. Dowd, Washington, D. C., also entered an appearance for intervenor.

Before WILBUR K. MILLER, BAZELON and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

These cases raise the question whether the Federal Communications Commission has acted fairly, expeditiously and within the framework of its legal powers in dealing with a complex problem relative to the allocation of radio frequencies to certain broadcasting stations.

I.

The American Broadcasting Company appeals from two orders of the Federal Communications Commission granting successive "special service authorizations" to the Albuquerque Broadcasting Company, permitting the latter to operate station KOB on a frequency of 770 kilocycles, unlimited time, at 50 kilowatts during the day and 25 kilowatts at night. A "special service authorization" is a form of temporary permit, of a nature to be described in detail later in this opinion. The basis of appeal by the American Broadcasting Company is its claim—admitted by both the Commission and the Albuquerque Broadcasting Company, intervenor—that operation of station KOB as thus authorized substantially interferes with the protected secondary service of station WJZ, New York, an affiliate of the American Broadcasting Company which operates as a Class I-A station on 770 kilocycles with power of 50 kilowatts, unlimited time.[1]

1. The Commission's "Standards of Good Engineering Practice Concerning Standard Broadcast Stations (550–1600 kc)", 4 F.R. 2862, et seq., July 8, 1939; 1 (Pt. 2) Pike & Fischer, Radio Regulation, par. 81:3, et seq., provide the following definitions:

"Class I stations are dominant stations operating on clear channels as follows:

"(1) Class I stations operate with powers of not less than 10 or more than 50 kw. These stations are designed to render primary and secondary service over an extended area and at relatively long distances, hence have their primary service areas free from objectionable interference from other stations on the same and adjacent channels and secondary service areas free from objectionable interference from stations on the same channels.

"(2) From an engineering point of view, Class I stations may be divided into two groups:

"(a) The Class I stations in Group 1 are those assigned to the channels allocated by section 3.25, paragraph (a), on which duplicate nighttime operation is not permitted * * *.

"(b) The Class I stations in Group 2 are those assigned to the channels allocated by section 3.25, paragraph (b), on which duplicate operation is permitted; that is, other Class I or Class II

Before turning to the specific contentions of the parties, we find it necessary to set out in some detail the factual background. Station KOB, Albuquerque, was operating under a license of the Department of Commerce as early as 1922. In 1928 the Federal Radio Commission assigned KOB the frequency of 1180 kilocycles, at a power of 10 kilowatts. In May 1940 a permit was issued by the Communications Commission to KOB permitting an increase of power to 50 kilowatts and designating it as a Class I station. KOB was at that time the only station licensed to operate at night on 1180 kilocycles.

In 1941 the United States negotiated a treaty with several other countries in the North American area, including Canada and Mexico, which was designed to allocate certain frequencies to each country free of interference from the other countries, thus facilitating better service in each. This treaty (the North American Regional Broadcasting Agreement) [2] did not permit of assigning an American station to the frequency of 1180 kilocycles, which was the frequency on which KOB operated. As the Agreement itself did not provide upon what frequency a station such as KOB would thereafter operate, a serious problem confronted the Communications Commission. In an effort to solve it, the Commission in September 1940 proposed to assign KOB to the frequency 1030 kilocycles, at a power of 50 kilowatts, operating unlimited time as a Class II station. At that time station WBZ, Boston, was operating as a Class I-A station on that same frequency, and in order to permit the change, the license of WBZ would have had to be modified from a Class I-A to a Class I-B status. WBZ opposed this change and Commission engineers made a study of another proposed

frequency, that of 1200 kilocycles. The use of that frequency, however, was found not to be feasible. In February 1941 the Commission proposed assigning KOB to 1030 kilocycles (as the only frequency then available) at 10 kilowatts power, unlimited time, and further provided for an increase of power to 50 kilowatts upon construction of a directional antenna and proof of performance. KOB objected, as did WBZ, but both withdrew their objections when it was made clear that the assignment to 1030 kilocycles was a temporary one. Accordingly, in March 1941 KOB was so licensed, the Commission stating that "consideration of the question as to which frequency should be permanently assigned this station [will] be deferred until an appropriate application presents that issue." Shortly thereafter KOB applied for a special service authorization to operate on 1030 kilocycles at 50 kilowatts day and 25 kilowatts night, unlimited time, which was granted in June, 1941.

While these proceedings were going on, the Commission began a survey to determine on which frequency KOB could best operate, and made field recordings of interference at various points. Some measurements taken in 1941, before atmospheric conditions rendered additional surveys impossible, indicated that KOB would have a wider area of interference-free operation on 770 kilocycles than on 1030 kilocycles, where considerable interference to both KOB and WBZ existed. On October 14, 1941, the Commission on its own motion modified KOB's special service authorization to specify 770 kilocycles in lieu of 1030 kilocycles. Further measurements were taken, but before anything conclusive could be determined the United States entered

stations operating unlimited time may be assigned to such channels * * *.

"Hereafter, for the purpose of convenience, the two groups of Class I stations will be termed Class Ia or Ib in accordance with the assignment to channels allocated by section 3.25(a) or 3.25(b).

"Class II stations are secondary stations which operate on clear channels with powers not less than 0.25 kw. or more than 50 kw. These stations are required to use a directional antenna or

other means to avoid causing interference within the normally protected service areas of Class I stations or other Class II stations. These stations normally render primary service only, the area of which depends on the geographical location, power, and frequency * * *."

2. United States Treaty Series 962, Department of State, 1937; 55 Stat. 1005; 1 Pike & Fischer RR, Par. 41 et seq.

World War II and the work was necessarily suspended.

WJZ protested the assignment of KOB to 770 kilocycles. WJZ was classified as a clear channel station and under its license was entitled to interference-free operation. Acting on this protest, the Commission held in late 1941 and early 1942 that the operation of station KOB on 770 kilocycles was temporary, and that if at any later time a permanent assignment was made, the party aggrieved could then protest. Again, as in the KOB-WBZ dispute, upon the understanding that the assignment was temporary, until a permanent billet could be found for KOB, and also having regard to the outbreak of war, WJZ did not press its objections to the action of the Commission in maintaining the *status quo* by successive renewals of KOB's special service authorization.

In early 1944 KOB requested a construction permit and regular license for 770 kilocycles, unlimited time. WJZ intervened in these proceedings, and sought a continuance for about three months. In order to get KOB's consent to the delay, WJZ agreed not to oppose any further extension of KOB's special service authorization on 770 kilocycles during the pendency of the litigation. After several further delays a hearing was finally held and the record closed on January 12, 1945. Before decision of that case, the Commission initiated the so-called "clear channel hearing" to determine the appropriate classification and best use of all clear channel frequencies in the United States, of which 770 kilocycles was but one. At first WJZ requested that the KOB proceedings be held up until determination of the clear channel proceedings. This motion was never acted upon by the Commission. However, later in 1945 WJZ requested a prompt decision in the KOB case and in early 1946 filed a motion requesting dismissal of the KOB applications. These motions were denied in April and May 1946. In August 1946 the Commission issued a notice entitled "Statement of Procedure to be Followed by the Commission in Connection with Applications to Operate on I-A Channels," in which it set forth that its policy would be not to consider applications to operate on clear channels until after the determination of the clear channel proceedings. It accordingly put the KOB application in the pending file.[3]

The clear channel proceedings have not as yet been concluded. They were apparently delayed (at least at one stage) by the request of a Senate Committee that these proceedings not be determined until the completion of a new North American Regional Broadcasting Agreement, and then perhaps further delayed so that the matter could be considered by the Senate itself.[4] The Commission evidently considers that some congressional action along these lines may be forthcoming, and should be awaited. The new North American Regional Broadcasting Agreement has been negotiated but has not as yet been ratified. Accordingly, the status of the clear channel proceedings is quite uncertain, and the future status of the KOB application for permanent licensing on 770 kilocycles is equally unclear.

It is in this background that we must view the two appeals here before us. Both of them are from further extensions by the Federal Communication Commission, each for a six months period, of applications by KOB for special service authorizations to permit it to continue operating, as it has been since 1941, on 770 kilocycles. The Commission granted those authorizations, stating on December 14, 1949, after oral argument *en banc,* with regard to the first application:

"Since the question of KOB's permanent assignment involves the classification of two important clear channels, 770 kc and 1030 kc, it cannot be determined until after a decision in the Clear Channel Hearing. The latter proceeding contemplates a possible reclassification of all of the clear channels and cannot be decided piecemeal. In fact, WJZ itself has recognized and strongly argued that the solution of the

3. New applications for clear channel frequencies were dismissed but the KOB application was retained because a lengthy hearing had already been held on it.

4. Hearings on S. 2231, 80th Cong., 2d Sess., pp. 2–4 (1948); Sen.Rep.No.49, 81st Cong., 1st Sess., pp. 5–10 (1949).

KOB problem is subsidiary to and dependent upon a decision in the Clear Channel Hearing.

"Thus all that can be decided now is the question of how KOB should operate in the interim period until its permanent assignment can be determined. Upon consideration of all of the facts we are of the opinion that the *status quo* should be maintained. A change in the KOB frequency, which could only be another temporary expedient, should not be undertaken in the absence of a compelling reason; and we find no such reason here. WJZ has suggested that KOB should return to the facilities specified in its license, 1030 kc with power of 10 kw. There is no question but that this would result in severe interference to WBZ and at least some loss of service to KOB. The Commission recognized in 1941 that KOB's assignment on 1030 kc was unsatisfactory and determined that it should be placed on 770 kc until a final solution of the problem was found. WJZ has advanced no satisfactory reason why this determination should be disturbed at this time. Moreover maintenance of the *status quo* would be in accord with the agreement freely entered into by WJZ in 1944.

"We therefore deny WJZ's motion and grant KOB's application for extension of Special Service Authorization."

The American Broadcasting Company took an appeal from this order, which appeal is one of the two now before us. On February 23, 1950, a further special service authorization requested by KOB was granted by the Commission, which stated: "That the aforesaid petition has not alleged any changes in the material facts or circumstances surrounding the operation of station KOB on frequency 770 kc under special service authorization and has advanced no new and satisfactory reason why previous determinations with respect to such operation should be disturbed at this time and that therefore the *status quo* of KOB operation should be maintained pending the outcome of the appeal of the American Broadcasting Company, Inc. from the Commission's Order of December 14, 1949 * * *."

This order was also the subject of appeal.

II.

At this point, it is well to emphasize certain fundamentals. "The policy of the [Communications] Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license." Federal Communications Commission v. Sanders Bros. Radio Station, 1940, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869. "No licensee obtains any vested interest in any frequency. The Commission for specified reasons may revoke any station license pursuant to the procedure prescribed by § 312(a) and may suspend the license of any operator on the grounds and in the manner specified by § 303(m). It may also modify a station license if in its judgment 'such action will promote the public interest, convenience, and necessity, or the provisions of this chapter * * * will be more fully complied with.' § 312(b). And licenses for broadcasting stations are limited to three years, the renewals being subject to the same considerations and practice which affect the granting of original applications. § 307(d). But in all those instances the licensee is given an opportunity to be heard before final action can be taken." Ashbacker Radio Corp. v. Federal Communication Commission, 1945, 326 U.S. 327, 331–332, 66 S.Ct. 148, 150, 90 L.Ed. 108. Further, it must be recalled that "In granting or withholding permits for the construction of stations, and in granting, denying, modifying or revoking licenses for the operation of stations, 'public convenience, interest, or necessity' was the touchstone for the exercise of the Commission's authority. While this criterion is as concrete as the complicated factors for judgment in such a field of delegated authority permit, it serves as a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy." Federal Communications Commission v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 137–138, 60 S.Ct. 437, 439, 84 L.Ed. 656.

Turning to the problems of the present case: we think that however it be

labeled, a special service authorization is a form of license, and one within the power of the Commission to grant. Section 1.325 of the Commission's Rules and Regulations, under which such authorizations are issued, provides:

"* * * (a) Special service authority may be issued to the licensee of a standard broadcast station * * * for a service other or beyond that authorized in its existing license for a period not exceeding that of its existing license.

"(b) * * * a satisfactory showing must be made in regard to the following, among others:

"(1) That the requested operation may not be granted on a regular basis under the existing rules governing the operation of standard broadcast stations;

"(2) That experimental operation is not involved as provided for by Section 3.32 of the Rules and Regulations;

"(3) That public interest, convenience, and necessity will be served by the authorization requested." 1 Pike & Fischer, RR, par. 51:325.

That section was promulgated pursuant to the general rule-making power of the Commission set forth in section 303(r) of the Communications Act.[5] In performing its functions under that Act the Commission is given a broad discretion. The statute contemplates that the Commission will "take the lead in exploring the possibilities of radio, and we think it unlikely that Congress had in mind a particular method to this end." Crosley Corp. v. Federal Communications Commission, 70 App.D.C. 312, 315, 106 F.2d 833, 836, certiorari denied 308 U.S. 605, 60 S.Ct. 142, 84 L.Ed. 506. The purpose of Congress in establishing the Commission was to set up an expert agency capable of coping with the ever-changing and constantly-increasing problems of a booming industry. "The Communications Act is not designed primarily as a new code for the adjustment of conflicting private rights through adjudication. Rather it expresses a desire on the part of Congress to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission. * * * Underlying the whole law is recognition of the rapidly fluctuating factors characteristic of the evolution of broadcasting and of the corresponding requirement that the administrative process possess sufficient flexibility to adjust itself to these factors." Federal Communications Commission v. Pottsville Broadcasting Co., supra, 309 U.S. at page 138, 60 S.Ct. at page 439, 84 L.Ed. 656.

■ In the absence of specific restrictions in the Act we find no basis for saying that special service authorizations permitting temporary operation on a frequency other than that specified in a station's license are illegal *per se* as being outside the Commission's authority. There is no showing that such authorizations are not in proper cases a reasonable means for implementing the purposes of the Act. That being true, the question before us is not so much the general substantive power of the Commission, but rather the propriety of its exercise in this case and of the procedure which the Commission has here followed. And the answer to that turns primarily on the application of section 312(b) of the Communications Act to the facts before us. That section provides: "(b) Any station license after June 19, 1934, granted under the provisions of this chapter or the construction permit required hereby and after such date issued, may be modified by the Commission either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this chapter or of any treaty ratified by the

5. That section empowers the Commission to: "Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party." Act of June 19, 1934, c. 652, § 303, 48 Stat. 1082, as amended May 20, 1937, c. 229, §§ 5, 6(a, b), 50 Stat. 190, 191, 47 U.S.C.A. § 303(r).

United States will be more fully complied with: *Provided, however,* That no such order or modification shall become final until the holder of such outstanding license or permit shall have been notified in writing of the proposed action and the grounds or reasons therefor and shall have been given reasonable opportunity to show cause why such an order of modification should not issue." [6]

The Supreme Court has interpreted that section in Federal Communications Commission v. National Broadcasting Co., 1943, 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374, the KOA decision, a case somewhat similar to the one now before us, in that the modification there involved was the licensing of another station to operate on the same frequency as a pre-existing licensee (KOA), causing objectionable interference. The Court, in holding that KOA must be made a party to the proceeding, said: "We can accord no other meaning to the language of the proviso which requires that the holder of the license which is to be modified must have notice in writing of the proposed action and the grounds therefor and must be given a reasonable opportunity to show cause why an order of modification should not issue. * * * A licensee cannot show cause unless it is afforded opportunity to participate in the hearing, to offer evidence, and to exercise the other rights of a party." 319 U.S. at pages 245–246, 63 S.Ct. at page 1038, 87 L.Ed. 1374.[7]

The American Broadcasting Company contends that under the KOA decision whenever the Commission seeks to modify, directly or indirectly, an outstanding license, it must give the licensee an opportunity to present its side of the question and to introduce evidence, and that the Commission must base its decision on the record before it. Since WJZ was never accorded such a hearing on issuance of the special service authorizations, and the Commission's action was not based on such a rec-

ord, it is argued that the grants were improper. Two immediate differences appear, however, between the KOA case and the instant proceeding. First, a treaty is involved here, and was the cause of relocating station KOB. Second, in the KOA case a regular license was issued the new station whereas here a temporary special service authorization was granted. As to the effect of the treaty, it is sufficient to say that to the extent reasonably possible a treaty and an earlier statute should be interpreted as consistent; that the hearing requirements of section 312(b), by their terms, apply to modifications resulting from a treaty; that the original treaty (NARBA) did not by its terms or by implication require the procedure here followed; and that in fact the Federal Communications Commission in its general order implementing NARBA complied with section 312(b). Thus the fact that a treaty is involved is not determinative of the issues here presented. The problem with regard to the status of the special service authorizations is more complex.

### III.

It will be recalled that in 1941, when the Commission first issued what it denominated a "special temporary service authorization" to KOB to operate on 770 kilocycles, the Commission said in overruling WJZ's request for a hearing that the authorization was "temporary," for the purpose of ascertaining "by actual operation on a temporary basis what facilities to be used by Station KOB on a regular basis would best serve public interest, convenience and necessity." The Commission further said "that if and when any assignment on a regular basis is made * * * which, in any way, aggrieves or adversely affects petitioner's [WJZ's] interests, petitioner will have 20 days * * * within which to file a petition for rehearing." Measurements were to be taken with a

6. Act of June 19, 1934, c. 652, § 312, 48 Stat. 1086, 47 U.S.C.A. § 312(b).

7. See also L. B. Wilson, Inc. v. Federal Communications Commission, 83 U.S. App.D.C. 176, 186, 170 F.2d 793; Woodmen of the World Life Ins. Soc. v. Federal Communications Commission, 70 App.D.C. 196, 198, 105 F.2d 75, 77, certiorari denied 308 U.S. 588, 60 S.Ct. 112, 84 L.Ed. 492; Journal Co. v. Federal Radio Commission, 60 App.D.C. 92, 95, 48 F.2d 461, 464.

view to determining KOB's future location on the spectrum.

■ Were the original authorization here in issue, there would appear to be little difficulty. Section 312(b) and the KOA decision only require that a reasonable opportunity to be heard be afforded, and do not necessarily require that the same type of hearing be held in every proceeding before the Commission concerning modification of licenses. Throughout the entire field of Anglo-American jurisprudence it is recognized that the word "reasonable," like the phrase "due process," is one of changing content, varying with the particular circumstances and context in which it is used. Federal Communications Commission v. WJR, 1949, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353. To require a full-dress hearing for the issuance of a temporary short-term, emergency license would be in effect to negate the power of the Commission to deal with a large variety of exigent situations. While the burden would have been on the Commission, if its action had been challenged, to justify its original failure to grant a full hearing, we think that under the circumstances as they existed in 1941 the Commission might well have succeeded in sustaining that action.[8]

But the propriety or impropriety of issuing the original special service authorization is not the question before us. The question with which we are primarily concerned is whether, almost ten years after the first temporary license for a six months period was issued, and after similar licenses successively have been issued to permit operation over that long span of time, the

Commission can still limit hearings on the renewals to the summary procedure which it originally followed. The Commission argues that the American Broadcasting Company has waived any such claim of error because it did not appeal from the original grants. The very expression of this argument demonstrates its untenability. The original grants involved no more than temporary authorizations which expressly, and under the circumstances of their issuance, negated the idea that they would continue for any substantial period of time, or that the American Broadcasting Company would not have the right to a hearing at a later date. No one contemplated the long delay which has since occurred. In Radio Station WOW v. Federal Communications Commission, 87 U.S.App.D.C. 226, 184 F.2d 257, this court permitted one radio station to oppose renewal of another station's license, though it had failed to oppose the original grant, where "all parties, acting in good faith upon a factual matter, were in error and * * * the error is asserted to have resulted in an unauthorized impingement upon an existing license." (184 F.2d at page 260). Although the error there was with regard to the amount of possible interference between the two stations, we think like principles control here where the error is as to duration of the interference.[9]

■ Turning to the question whether the proceedings before the Commission on the two authorizations now here on appeal satisfy the requirements of section 312(b), we must answer that question in the negative. There comes a point when what has

---

8. "* * * the terms of § 312(b) must be read in the light of the Act's general procedural authorization in § 4(j), which empowers the Commission to 'conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice.'

   "In this wording Congress was mindful not only of the ends of justice but also of the proper dispatch of the Commission's business, a matter not unrelated to achieving the ends of justice, and left largely to its judgment the determination of the manner of conducting its business which would most fairly and reasonably accommodate those ends." Fed-

eral Communications Commission v. WJR, supra, 337 U.S. at page 282, 69 S. Ct. at page 1106, 93 L.Ed. 1353.

9. This is equally true of the claimed estoppel arising out of the 1944 agreement not to oppose further special service authorizations. At that time all parties thought that those proceedings would be determined in the near future and did not anticipate that they would be shunted to one side pending negotiation and ratification of a new treaty, then possible congressional consideration of the issues raised in the clear channel proceedings.

been designated a "temporary measure" lasts for so long, and shows so little sign of being terminated in the foreseeable future, that to continue to categorize it as "temporary" is to ignore the realities of the situation. A license itself, under the Act, can only be granted for three years duration. Thus, the special service authorizations here in question have lasted for almost three times the term of the modifying license which was held invalid in the KOA case.

We cannot agree that the Commission can maintain the *status quo* indefinitely and in effect semi-permanently by offering the argument that the ultimate determination of KOB's status must depend upon the outcome of the clear channel proceedings. It is true that those proceedings may ultimately lead to very different conclusions regarding KOB than those which might be reached in this case. And that in turn might result in KOB having to incur additional expenses and frequency changes. But even if this would have been a valid argument in 1945, when the clear channel proceedings were first commenced, it cannot be controlling now. Until that time delay had been due primarily to the war, and all parties had acquiesced. Further, it then appeared that the clear channel proceedings would be disposed of promptly. But that is not the situation now before us. The Commission has made no showing of even a reasonable possibility that the clear channel proceedings will be completed shortly.[10] And apparently it has conducted no further tests to determine where KOB should be located. WJZ has thus been required to bear a large part of the loss resultant from the original NARBA treaty arrangement eliminating frequency 1180. Interference caused by the operation of KOB causes the loss of approximately 23,-000,000 possible listeners to WJZ. The

Commission has in effect permitted this substantial loss to occur and to continue.

We recognize that the Commission's task is most difficult. The vast number of complex problems in radio, television, and wire communications imposes a heavy burden—often presenting situations well-nigh impossible of solution. And of course the courts cannot compel solutions where none exist. But on occasion the courts must act to make certain that what can be done is done. Agency inaction can be as harmful as wrong action. The Commission cannot, by its delay, substantially nullify rights which the Act confers, though it preserves them in form. Ashbacker Radio Corp. v. Federal Communications Commission, 1945, 326 U.S. 327, 334, 66 S.Ct. 148, 90 L.Ed. 108. "Proper administration of the law by governmental agencies such as the Communications Commission requires careful observance of the procedures established by Congress. For the protection of the people generally, to say nothing of the agencies themselves, convenience of administration cannot be permitted to justify noncompliance with the law, or the substitution of fiat for adjudication." Heitmeyer v. Federal Communications Commisson, 68 App.D.C. 180, 189, 95 F.2d 91, 100. There would appear to be many possibilities for action in this case.[11] The Commission has never made a determination based upon a thorough study of those possibilities. We think it is incumbent upon the Commission so to do. Whether it would reach the same or a different conclusion upon a proper hearing is something about which we need not speculate.

We cannot, even if we wished to do so, determine the ultimate disposition which should be made of the WJZ–KOB controversy, or direct the Commission how

---

10. See footnote 4, supra, and related text.

11. For example, there has been a lengthy record compiled before the Commission with regard to the frequency on which KOB should permanently be authorized to operate. If it is out of date, bringing it up to date to cover current issues should

not be difficult. It may be that a hearing would show that by means of a directional antenna and more limited power at night-time the interference caused by KOB to WJZ's secondary service could be greatly diminished, or that by similar devices KOB could effectively operate on its licensed channel 1030 kilocycles.

to exercise its discretionary powers.[12] But we can provide "a remedy against inaction";[13] we can direct the Commission to exercise its discretion in accordance with law. We have power to reverse, and to "remand the case to the Commission to carry out the judgment of the court."[14]

Reversal, without more, will not meet the needs of this case. For KOB has been operating on the frequency of 770 kilocycles for ten years. And there may be some doubt as to whether it can feasibly be returned to operation on its licensed frequency of 1030 kilocycles, since station WBZ, Boston, withdrew opposition to that grant on the understanding that it was a temporary, stop-gap measure. Certainly KOB should not be forced off the air or unduly compelled to limit service. An immediate withdrawal of its special service authorizations might well produce that result. Accordingly, greater flexibility is necessary in disposing of this case. United States v. Morgan, 1939, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211; Addison v. Holly Hill Fruit Products, supra, 322 U.S. at page 621, 64 S.Ct. 1215, 88 L.Ed. 1488. We think the Commission should be given an opportunity to consider anew the difficult practical problem which confronts it. If appropriate proceedings are promptly begun and expeditiously carried forward, we would not regard it as inconsistent with our holding here if the Commission were to preserve the *status quo* for such reasonable period as may be necessary to make "a valid determination * * * with all deliberate speed". Addison v. Holly Hill Fruit Products, supra, 322 U.S. at page 619, 64, S.Ct. at page 1222, 88 L.Ed. 1488; Lambros v. Young, 79 U.S.App.D.C. 247, 145 F.2d 341.

Accordingly, we reverse the orders of the Commission and remand the cases for action not inconsistent with this opinion.

Reversed and remanded.

12. This court is not "entitled to revise the Commission's decision". Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 1933, 289 U.S. 266, 276, 53 S.Ct. 627, 632, 77 L.Ed. 1166. Such a determination would be administrative or legislative rather than judicial in character. Federal Radio Commission v. General Electric Co., 1930, 281 U.S. 464, 50 S.Ct. 389, 74 L.Ed. 969. And while such powers, permissibly under the Constitution, may be vested in this court, Congress has not chosen to do so under the Communications Act.

13. Addison v. Holly Hill Fruit Products, 1944, 322 U.S. 607, 623, 64 S.Ct. 1215, 1224, 88 L.Ed. 1488. Though of course this court "cannot direct in advance the order of precedence in the Commission's calendar." WJR v. Federal Communications Commission, 84 U.S.App.D.C. 1, 6, 174 F.2d 226, 231, affirmed in this regard, reversed on other grounds, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353.

14. The Act provides: "At the earliest convenient time the court shall hear and determine the appeal upon the record before it, and shall have power, upon such record, to enter a judgment affirming or reversing the decision of the Commission, and in event the court shall render a decision and enter an order reversing the decision of the Commission, it shall remand the case to the Commission to carry out the judgment of the court: *Provided, however*, That the review by the court shall be limited to questions of law and that findings of fact by the Commission, if supported by substantial evidence, shall be conclusive unless it shall clearly appear that the findings of the Commission are arbitrary or capricious." 47 U.S.C.A. § 402(e).