627 F.2d 322
 200 U.S.App.D.C. 269
 MCI TELECOMMUNICATIONS CORPORATION, Microwave
Communications, Inc. and N-Triple-C Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
Southern Pacific Communications Co. Aeronautical Radio, Inc.
Air Transport Association of America
American Telephone and Telegraph Co.
State of Hawaii
Computerized Automotive Reporting Service, Inc.
Tele-Communications Association
Western Union Telegraph Company, Intervenors.
 No. 79-1119.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 14, 1980.
Decided April 2, 1980.
 
 Petition for Review of an Order of the Federal Communications commission.
 William J. Potts, Jr., Washington, D. C., with whom Michael H. Bader, Kenneth A. Cox and John M. Pelkey, Washington, D. C., were on brief, for petitioners.
 Sheldon M. Guttman, Counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, John E. Ingle, Asst. Gen. Counsel, F. C. C., John H. Shenefield, Asst. Atty. Gen.,* John J. Powers, III and William Coston, Attys., U. S. Dept. of Justice, Washington, D. C., were on brief, for respondents.
 
 
 1
 Charles Lister, Washington, D. C., with whom Alfred A. Green, Francine J. Berry, New York City, Edgar Mayfield, Bedminster, N. J., and F. Mark Garlinghouse, New York City, were on brief, for intervenors American Telephone and Telegraph Co.
 
 
 2
 Rosel H. Hyde, Laurel R. Bergold and Herbert E. Marks, Washington, D. C., were on brief, for intervenor State of Hawaii.
 
 
 3
 Charles R. Cutler, John L. Bartlett and James E. Landry, Washington, D. C., were on brief, for intervenor Aeronautical Radio, Inc., et al.
 
 
 4
 Thormund A. Miller, San Francisco, Cal., John V. Kenny, James M. Tobin, Stephen Ailes and Herbert E. Forrest, Washington, D. C., were on brief, for intervenor South Pacific Communications Co.
 
 
 5
 Also Robert B. Nicholson and Ron M. Landsman, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent, United States of America.
 
 
 6
 Also Joseph M. Kittner, Normal P. Leventhal and Lawrence J. Movshin, Washington, D. C., entered appearances for intervenor, Computerized Automotive Reporting Service, Inc., et al.
 
 
 7
 Also Joel Yohalem, Washington, D. C., entered an appearance for intervenor Western Union Telegraph Co.
 
 
 8
 Before ROBINSON and WALD, Circuit Judges, and JUNE L. GREEN,** United States District Judge for the District of Columbia.
 
 
 9
 Opinion for the Court filed by Circuit Judge WALD.
 
 WALD, Circuit Judge:
 
 10
 At issue here are two decisions of the Federal Communications Commission (FCC), the first[1] dated August 12, 1977 and the second[2] (the FCC's reconsideration of the first) November 30, 1978. Both relate to a June 2, 1976 FCC decision[3] which found American Telephone and Telegraph Company's (AT& T's) 1973, 1974, 1975 and 1976 Wide Area Telecommunication Service (WATS) tariff revisions to be unsupported by the data AT&T produced. The FCC's 1976 decision nevertheless continued the effectiveness of those revisions pending final FCC action and, through its 1977 and 1978 decisions, the FCC has allowed those revisions to remain in effect.
 
 
 11
 The petitioners (referred to collectively as MCI[4] challenge what they refer to as the FCC's "acquiescence" to AT&T in allowing its WATS tariffs revisions to continue in effect for such a long period without any determination by the FCC pursuant to the Communications Act of 1934 that those revisions are "just and reasonable."[5] In fact, MCI asserts that the FCC in its 1976 decision found AT&T's WATS tariffs un just and un reasonable, and argues that those tariffs are therefore unlawful and may not be continued in effect pursuant to the FCC's 1977 and 1978 decisions, even temporarily. In contrast, AT&T asserts that in 1976 the FCC merely concluded that AT&T had not met its statutory burden of showing its tariff revisions were "just and reasonable," and argues therefore that the 1977 and 1978 decisions maintaining those revisions in effect pending a final determination as to what rates are "just and reasonable" were not abuses of the FCC's discretion.
 
 
 12
 We recognize that the FCC is now, and has been for several years, in a period of transition in determining proper methods for evaluating the "reasonableness" and hence lawfulness of carrier-initiated communication tariffs such as these, and that the present limited controversy over WATS tariffs may itself be superseded if the FCC establishes comprehensive procedures for approving or setting AT&T's tariffs for all of the communication services it provides.[6] Nevertheless, there must be some limit to the time tariffs unjustified under the law can remain in effect (even if the FCC is in no position to decide whether they are actually unlawful). Otherwise, the regulatory scheme Congress has crafted becomes anarchic and whatever tariff rates the "regulated" entity files become, for all practical purposes, the accepted rates. Therefore, although we decline to act now on MCI's petition for review of the FCC's 1977 and 1978 decisions, we remand the case to the FCC for the preparation of, and report to the court on, a schedule for the expeditious resolution of this controversy within a reasonable time. This division of the court will retain jurisdiction over the case to insure compliance with the court's decision.
 
 I. BACKGROUND
 
 13
 AT&T first filed FCC tariffs for, and offered, "outward" WATS[7] in 1961 and "inward" WATS[8] in 1967, justifying the lower rates charged for WATS than for regular long distance service (MTS[9] on the ground that WATS used more automatic equipment and offered fewer special services e. g., no itemized billing. The FCC first began to supervise WATS in 1961.[10] In 1964 the FCC's Common Carrier Bureau concluded there was a public need for WATS but recommended AT&T study various aspects of WATS which the Bureau questioned.[11] In 1965, the FCC adopted that recommendation.[12]
 
 
 14
 Two other proceedings begun around the same time are pertinent here. First, in 1965 the FCC began an inquiry to consider AT&T's overall tariff structure and the part the tariffs for each individual service should play in a comprehensive rate regulation scheme applicable to all AT&T communication services. In 1969 the FCC and AT&T agreed to a Statement of Ratemaking Principles and Factors in that proceeding, and in 1970 AT&T filed a revised WATS tariff complying with that Statement. Second, in 1968 the FCC began to evaluate AT&T's rates for TELPAK, its "private line" service. Because both involved interstate services of AT&T, the questions concerning comprehensive procedures to evaluate AT&T's tariffs were consolidated into the TELPAK proceeding in 1970.[13]
 
 
 15
 In 1972 the FCC set 8.5 percent as AT&T's allowable combined rate of return on WATS and its private line services.[14] Consequently, in 1973 the FCC allowed AT&T to further revise its WATS tariffs to achieve that rate of return pending a final decision in the comprehensive examination of AT&T's overall tariff structure, but the FCC expressly made those revisions subject to an accounting and possible refund.[15] The FCC noted that the method AT&T used in its 1973 filing to support its costs was "a serious attempt by AT&T to employ modern quantitative techniques" for estimating revenues.[16] In 1974 AT&T substantially revised its WATS tariffs; although it had some reservations, the FCC found those revisions were a step in the "right direction" and allowed them to become effective, again with an explicit accounting refund provision.[17]
 
 
 16
 AT&T's next WATS tariff revisions filed in 1975 were rejected by the FCC because AT&T asked for a higher overall rate of return 10.5 to 11 percent from WATS and private line services than the FCC earlier set as a ceiling.[18] Subsequently, in 1976 the FCC raised AT&T's allowable return on those services to 9.5 percent and allowed another AT&T revision conforming to that percentage to become effective, pending completion of an FCC investigation.[19]
 
 
 17
 Shortly thereafter the FCC released its 1976 decision which underlies the two orders now under review. The FCC's principal concern was with AT&T's use of an "alignment" method of accounting which maintained the existing relationship between WATS and MTS without reference to the costs of providing WATS:[20]
 
 
 18
 . . . A novel "alignment" ratemaking theory was relied upon by Bell in designing the aforementioned charges. The basis of Bell's "alignment" approach was that initial and additional period monthly charges for Outward and Inward MT and FBD WATS services could be justified solely by maintaining "consistent" rate relationships with MTS DDD charges over distance, and that therefore independent cost of service studies were not required to explain or support Outward and Inward MT and FBD WATS monthly charges. We have found that Bell's use of the "alignment" theory as the sole basis for justifying WATS charges is unacceptable and violative of clearly established Commission policy. Further, while ratemaking factors other than costs may be relevant, we found that the costs of providing Outward and Inward WATS services must be provided in the first instance as a benchmark to permit reasoned consideration of the lawfulness of departures from costs in rate design which might result from "alignment." Apart from the patent illegality of Bell's "alignment" approach, we found it was not justified for other reasons. Assuming arguendo it could be a valid ratemaking approach in general, there was no basis provided in the record for the key assumptions and judgments upon which "alignment" was based and the manner in which Bell applied "alignment," was theoretically and mechanically unsound and unacceptable. Finally, we found Bell's "alignment" approach resulted in preferential rate treatment for long-haul Outward and Inward WATS subscribers vis-a-vis short-haul Outward and Inward WATS subscribers and that this preference and discrimination had not been justified by Bell on the record.
 
 
 19
 The FCC thus found AT&T's 1974 to 1976 tariff filings unacceptable, since they all utilized the alignment method; AT&T's 1973 tariff revisions were also found unjustified, because of AT&T's failure to provide sufficient supporting data.
 
 
 20
 The FCC also acknowledged, however, that it lacked the requisite data to prescribe "just and reasonable" WATS rates either in the interim pending the establishment of prospective rates, or retroactively. Consequently, AT&T was given 210 days to file sufficient data to support a "just and reasonable" finding by the FCC.
 
 
 21
 Commissioner Washburn concurred, but (foresightedly, it appears) expressed reservations about requiring more detailed data from AT&T at the expense of unduly prolonging the proceeding:[21]
 
 
 22
 In today's action we have found the last four WATS tariffs filed by AT&T to be unlawful. Some of these tariffs have been in effect for over three years. Further we allow these unlawful rates to remain in effect for at least another six months after the decision is published in the Federal Register. The new filing directed in today's action will very likely be suspended for 60 days during which time the present unlawful rates will continue in effect, as is currently the case with Bell's Hi-Lo tariff. After the public has been paying these rates for four years we have no way of assuring that the new tariffs will be any better or worse than the present unlawful tariffs which they will replace. The result is a series of Bell tariffs, all of which the Commission finds unlawful but which customers must pay. Refunds cannot be made, despite the accounting order, because we have no legal tariff with which to compare and compute any overcharges. The Commission, therefore, has essentially lost control over the rates Bell charges customers.
 
 
 23
 . . . The "significant costs of regulatory delay" take the form of virtually unregulated rates for a major service. These costs are visited not upon the carrier but upon the public.
 
 
 24
 MCI, a party to the 1976 decision, submitted no proposed findings of fact or conclusions of law to the FCC.[22] Additionally, MCI did not seek judicial review of the FCC's 1976 decision.
 
 
 25
 The FCC also issued a decision in 1976 in the TELPAK proceeding regarding AT& T's tariff structure for all its communications services. That decision, inter alia, set forth a specific method of determining AT&T's costs for each service it provides, including WATS.[23] Representatives of AT&T and a task force of Common Carrier Bureau personnel met and devised an Implementation Manual for the cost methodology the FCC mandated. Two decisions[24] on reconsideration of that decision followed, and a petition for review of that decision is currently pending in this court.[25]
 
 II. THE 1977 AND 1978 FCC DECISIONS
 
 26
 Because of the requirements of the FCC's 1976 TELPAK decision on how costs for each service line should be determined, AT&T requested and was given an extension of time in which to file tariffs which would conform to the FCC's 1976 WATS decision.[26] Accordingly, AT&T filed further WATS tariff revisions in April 1977.[27] The FCC, however, again found AT&T's submissions unacceptable.
 
 
 27
 One concern of the FCC was whether WATS and MTS are "like" communications services under the statute;[28] if so they may not be treated differently without justification.[29] Thus, the FCC instituted a separate proceeding to determine whether WATS and MTS are competitive services. That proceeding later assumed substantial significance.
 
 
 28
 The projected rate of return for outward WATS in AT&T's 1977 filing was 19 percent with 11.6 percent for inward WATS. Many WATS customers opposed the 1977 revisions as setting rates too high, and common carriers in competition with AT&T complained that the rates were too low. Thus, MCI, as a competitor of AT&T, requested a "moratorium" on AT&T's expansion of WATS to ease the effect of what it terms AT&T's "anticompetitive" tariffs.[30] The FCC summarily rejected AT&T's 1977 tariff revisions, finding ten aspects of that filing which did not conform to the FCC's 1976 WATS decision.[31] Additionally, in the FCC's view the 1977 filing failed in nine respects to satisfy the FCC's 1976 TELPAK decision.[32]
 
 
 29
 The FCC decided to summarily reject AT&T's filing rather than to conduct further hearings at that point, because the FCC felt that the issues involved had already been examined in detail:[33]
 
 
 30
 Suspension and hearing is clearly not indicated here. We are rejecting the WATS tariff filing on numerous independent grounds which have already been the subject of prior Commission hearings and decisions, as cited in the above discussion. Relitigation of these matters in the context of this tariff filing, particularly when the material filed perpetuates deficiencies in ratemaking documentation and methodologies already specifically determined in prior decisions after hearings, would be a waste of the resources of both this Commission and other parties.
 
 
 31
 The net result of this decision was to keep AT&T's previous WATS tariff revisions in effect.
 
 
 32
 The FCC rejected MCI's allegations that AT&T's WATS tariff was "predatory" and "anticompetitive" as "conclusionary and (because they) lack specificity," although it agreed to consider MCI's charges at a later date.[34] Additionally, the FCC rejected MCI's request that it at least be allowed to purchase for resale, or otherwise share, WATS. A recent FCC decision had addressed the issue and allowed the resale of some AT&T communications services, but WATS was specifically excluded from that holding.[35] Thus, the FCC determined not to order sharing and allow resale of WATS "in the context of this particular tariff filing which we are rejecting in any event."[36]
 
 
 33
 AT&T was required to consult with the FCC's Common Carrier Bureau within 30 days and the Bureau staff was instructed "to meet with AT&T to provide guidance in developing a new WATS filing."[37] Thirty days after that meeting AT&T was to submit a proposed schedule for conducting studies of peak hour WATS usage and for ultimately filing lawful WATS tariffs. Additional proposals for the conducting of cross-elastic demand studies on MCI's charges of predatory and anticompetitive conduct were ordered to be submitted in another 60 days. Without discussion, the FCC deferred "pending further Commissioner Order"[38] the effective date of its 1976 WATS decision.
 
 
 34
 Commissioner Fogarty filed a separate statement describing the results of the latest round of proceedings as "frustrating and inconclusive."[39] He noted that the FCC's rejection of AT&T's tariff on 19 separate grounds put the FCC no closer to ending the proceeding than when it began, and concluded:[40]
 
 
 35
 . . . It is difficult for me to see how the public interest is served by the seemingly endless regulatory meandering.
 
 
 36
 I therefore endorse wholeheartedly the instructions of the staff of the Common Carrier Bureau to meet with AT&T to provide guidance in developing a new WATS filing. I think it essential, however, that the Commission itself exercise more active oversight in these tariff proceedings. I would, in fact, strongly urge that a supervisory Commissioner or committee of Commissioners be designated to oversee these consultations between the Bureau staff and AT&T to ensure the expeditious filing of new WATS tariff schedules in full compliance with the specific requirements of this Order.
 
 
 37
 In a motion for reconsideration, MCI moved the FCC to restore the pre-1974 WATS rates by requiring AT&T to refile its superseded 1973 tariffs. The FCC's 1978 decision on reconsideration denied that request on the same grounds that the FCC gave in 1976 for not prescribing interim WATS rates:[41]
 
 
 38
 We shall also deny MCI's and Conrail's request for a "roll back" of WATS rates to pre-1974 levels, i. e., the tariff in effect prior to the filing of Transmittal No. 11935 (which was found unjustified and therefore unlawful in Docket No. 19989, WATS, supra ). We had hoped the Docket No. 19989 record would be sufficient to permit us to affirmatively approve AT&T's tariff filing or prescribe alternatives. However, the record was insufficient to allow us to approve or prescribe rates and we found a "roll-back" could not serve the public interest basically because of the confusion it would cause for subscribers. See 59 FCC2d at 709. As to MCI's instant "roll back" request we continue to believe that such a temporary "roll back," pending submission of a revised filing, could create substantial confusion and administrative difficulties for existing and potential WATS subscribers.
 
 
 39
 As an alternative to restoring the pre-1974 rates, MCI's petition for reconsideration before the FCC also asked that AT&T be precluded from providing WATS to new customers or expanding the services it provides existing customers. The FCC also rejected that request:[42]
 
 
 40
 . . . We shall also deny MCI's alternative request that we prohibit AT&T from expanding WATS services while the present unjustified WATS tariffs remain effective. Although we are concerned that AT&T offers and continues to expand WATS services based on rates that have been found unjustified and therefore unlawful, there appears to be no other reasonable alternative at this time. The alternative suggested by MCI would have the effect of depriving potential users of any WATS service at all, while existing users would be able to retain their service at present levels. This substantial denial of an authorized service to a large portion of the public could be considered an imposition of a discrimination among users in violation of the Communications Act.
 
 
 41
 On the same day it denied MCI's request for reconsideration of its 1977 WATS decision, the FCC found WATS and MTS to be "like" communication services under the statute, in the separate proceeding the FCC began as the result of its 1977 WATS decision.[43] Because of that finding, the FCC concluded in its decision on reconsideration that AT&T's asserted cost savings for WATS would subsequently have to be justified in detail.[44]
 
 
 42
 Since we have found MTS and WATS services to be "like services" in Docket No. 21402, to aid the Commission in determining whether any rate differentials between MTS and WATS services are justified under Section 202(a), AT&T is now required in the next filing to justify its conclusory assertions of cost savings by itemizing and quantifying them on a dollar basis, and then showing clearly that such savings are logically and causally related to the actual rates filed for WATS services relative to MTS.
 
 
 43
 Again because of its "like" service finding, and its resultant concern that low WATS rates might unduly increase the demand for WATS as compared with MTS and result in more WATS equipment being built and utilized while MTS equipment is under-utilized, the FCC in its 1978 decision denying reconsideration emphasized its urgent need for data to determine whether WATS and MTS rates "overly encourage peak usage, thus requiring excessive plant additions and costs."[45] The FCC therefore required AT&T to file alternative proposals for studies of peak usage. The FCC also ordered AT&T to institute "a 'tracking' process to compare estimated (WATS demand) market results with actual historical results," as well as to make future projections ("ex ante " studies) of the data AT&T will rely on in revising its WATS tariffs.[46] The FCC stated that its "goal is to require AT&T to formulate verifiable predictions (of WATS market demand) by a means or method which is also verifiable."[47]
 
 
 44
 The FCC set March 1, 1979 for AT&T's filing of proposals called for by the 1978 order, "with the date for filing a replacement tariff to be determined as appropriate by the (FCC's Common Carrier) Bureau."[48] AT&T submitted proposals on the date the FCC set and again on May 1, 1979. The FCC gave public notice of AT&T's proposals on June 15, 1979 and asked for comments which several interested parties, including MCI, filed.[49] As we understand it, that is where this case now stands at the FCC.[50]
 
 
 45
 In bringing the FCC's 1977 and 1978 decisions here for review MCI alleges that the WATS rates AT&T now charges are "predatory in effect and intent"[51] i. e., too low[52] and that MCI is consequently losing business in the long distance telephone services it provides in competition with WATS. There is a clear "pattern" of AT&T filings of unsupported WATS tariffs, MCI charges, which when allowed to remain in effect for prolonged periods by the FCC give AT&T an unjustified "competitive advantage."[53]
 
 III. ANALYSIS
 
 46
 A. The Relationship Between §§ 204(a) and 204(b) of the Statute
 
 
 47
 Since the addition of § 204(b) to the statute in 1976 and the concurrent modification and redesignation of the previous § 204 provisions as § 204(a), there appear to be two separate routes the FCC may take in dealing with carrier-initiated tariff changes. Rather than finding that those two sections of the Act are in conflict, as MCI asserts, we conclude that § 204(a) and § 204(b) are complementary and designed to serve different purposes.
 
 
 48
 If it chooses to proceed under § 204(a),[54] the FCC must first decide between holding hearings on the carrier's proposed tariff revisions or allowing them to become permanently effective without hearings immediately after the 90 day public notice period provided by § 203(b)(1).[55] If the FCC decides to hold hearings, it then must decide between suspending the proposed revisions pending a final FCC decision on their lawfulness or allowing them to become effective in the interim. The FCC may, however, suspend proposed tariff revisions for only five months; if the FCC has not reached a final decision on their lawfulness by then, § 204(a) explicitly provides that the proposed revisions "shall go into effect . . . ."[56] If the proposals are for new services or increased charges, the FCC may order the carrier to keep track of the amounts customers pay to facilitate the FCC's additional power to require refunds to customers, if justified, of all or a part of the money so collected, upon completion of the FCC's investigation and a determination by it under § 201(b) of the statute as to what revisions are just and reasonable.
 
 
 49
 In contrast to § 204(a), the procedures Congress contemplated in enacting § 204(b) are much less rigorous and were designed to provide the FCC with greater, not less, flexibility in its consideration of proposed tariff revisions. Under § 204(b), the FCC need not engage in hearings and need not make a formal "just and reasonable" determination to approve part of a carrier's tariff revisions, or to make part or all of them effective temporarily. The FCC now has the authority under § 204(b) to take such steps "based upon a written showing by the carrier or carriers affected, and an opportunity for written comment thereon by affected persons, that such partial authorization is just, fair, and reasonable"; based upon a "similar showing," § 204(b) authorizes the FCC to make effective all or part of a tariff change proposal "on a temporary basis pending further order of the Commission."[57]
 
 
 50
 The FCC asked Congress in 1976 to give it the authority to approve parts of carrier-initiated tariffs or to approve such tariffs temporarily to give the FCC the flexibility to implement necessary tariff changes without undue delay. Under the original 1934 Act, the FCC had to approve or disapprove all aspects of a tariff revisions before any part of it could be found lawful for any period of time.
 
 
 51
 The FCC's requests grew out of a 1972 recommendation by the Administrative Conference of the United States for regulatory agencies with rate-setting authority:[58]
 
 
 52
 Regulatory statutes should be amended, to the extent that existing authority is lacking, to authorize rate-making agencies, as an adjunct to their power to suspend, to allow temporary rate increases, including partial increases, subject to appropriate conditions (including, where practicable, provision for refund if the interim increase is ultimately found unjustified). A temporary increase should be authorized only when the agency makes a preliminary judgment, on the basis of a written showing by the regulated company and an opportunity for comment thereon by affected persons, that a proposed increase is justifiable at least in part. Exercise of authority to grant temporary increases, rather than suspending a proposed increase in full or allowing it to go into effect without suspension, would mitigate the effects of regulatory lag. Similar authority to allow temporary and partial rate reductions, or other temporary changes, should also be sought where appropriate.
 
 
 53
 The rationale of the Administrative Conference was that the choice between the only two options then generally available to agencies, including the FCC i. e., suspension or no suspension often unduly affected their final decisions on the lawfulness of rates:[59]
 
 
 54
 The determinations of the Civil Aeronautics Board, Federal Communications Commission, Federal Power Commission, and Interstate Commerce Commission, whether to exercise or refrain from exercising their power to suspend and investigate newly filed rate proposals, are of great importance to regulated companies, their customers, and the general public. Although a decision not to suspend does not preclude an agency investigation at a later date (either sua sponte or upon complaint), inertia then plays a significant role. Moreover, once a tariff change is effectuated, in most cases the burdens of dislodging an existing rate rest upon its challenger. Since suspension of a rate initiates a proceeding that is likely to be protracted and costly, a decision to suspend is also an important action. The procedures by which rate proposals are suspended, including the various forms of private negotiation that often accompany the suspension process, can and should be improved.
 
 
 55
 The Senate Report on § 204(b) demonstrates that it was designed to give greater leeway to the FCC than it has under § 204(a) in dealing with carrier-initiated tariff revisions.[60]
 
 
 56
 Partial or Temporary Tariff Approval. Existing section 204 does not specifically authorize the Commission to separate questionable from legitimate aspects of a tariff filing prior to hearing and thus does not permit the Commission to suspend the former tariff elements and allow immediate implementation of the latter. The Commission is also without authority to permit a temporary tariff change. As a result, legitimate changes must await hearing on questionable aspects of the tariff and an unnecessary regulatory delay is created.
 
 
 57
 S. 2054 would amend section 204 to allow the Commission to make a preliminary judgment as to whether a tariff filing should become effective or be suspended in whole or in part pending hearing. In particular, new section 204(b) would enable the Commission to permit part of a tariff filing to go into effect based upon a written showing by the affected carrier or carriers, with opportunity for written comment by affected persons, that such partial authorization is just, fair, and reasonable. The new provisions would also enable the Commission, upon a similar written showing, to allow all or part of a tariff filing to become effective on a temporary basis subject to further Commission orders.
 
 
 58
 In the Committee's judgment, this new authority to approve temporary or partial tariff changes will provide the Commission with the flexibility needed to mitigate unnecessary effects of regulatory delay which presently attend the hearing and suspension process. In this regard, the Committee notes that the Commission has stated its intention to reach decisions pursuant to this new authority within the extended 90-day notice period proposed by this legislation. The Committee fully expects the Commission to be able to do so.
 
 
 59
 MCI argues that since the enactment of § 204(b), no tariff revision may go into effect temporarily, as have the AT&T WATS tariff revisions at issue here, without a § 204(b) written showing that they are just, fair and reasonable and an opportunity for interested parties to file comments. We can find nothing, however, in the legislative history of § 204(b) to indicate that it was designed to override the provision in § 204(a) that carrier-initiated tariffs "shall go into effect" temporarily at the end of any suspension period if the FCC has not completed its determination of their lawfulness,[61] and MCI cites us to no authority other than § 204(b) itself.
 
 
 60
 Section 204(b) states that its requirements are effective "(n)otwithstanding the provisions of subsection (a) of this section"[62] i. e., § 204(a) but that does not necessarily mean § 204(b) must always prevail whenever tariff revisions are to go into effect temporarily. This interpretation is buttressed by the fact that § 204(a) dictates what occurs absent any timely FCC action: the proposed revisions automatically go into effect under § 204(a) "(i)f the (FCC) proceeding has not been concluded and an order made within the period of the suspension . . . ."[63] Section 204(b), on the other hand, sets forth the allowable results of an affirmative FCC action: the FCC "may allow part of a charge, classification, regulation or practice to go into effect . . . ,"[64] if the required written showing is made and an opportunity provided for public comment. Congress thus seems to have envisioned that the FCC could, in its discretion, determine that in some instances the procedures envisioned in § 204(a) may not be appropriate, and that just and reasonable tariffs can be established in part or temporarily with the § 204(b) showing.[65]
 
 
 61
 Because the statute itself does not clearly indicate that Congress meant for § 204(b) to supplant § 204(a) and always require the showing which is necessary under § 204(b) before tariff revisions may go temporarily into effect, and because of the rationale stated in the 1976 Senate Report, we conclude that § 204(b) was designed to complement rather than supersede § 204(a). If Congress had intended to change its explicit mandate in § 204(a), it would have said so. The FCC did not invoke § 204(b) here, and we conclude that it need not have done so.
 
 B. The Nature of the FCC's 1976 Decision
 
 62
 We are initially confronted by a patent enigma in the FCC's 1976 decision between its repeated assertions that AT&T's 1973 to 1976 WATS tariff revisions are "unlawful"[66] as well as "NULL AND VOID,"[67] and its concurrent decision to continue those revisions in effect for a period of over three years thus far, pending a still elusive final determination of what rates are proper. The statute reads with superficial clarity: to be lawful, charges must be "just and reasonable" while, conversely, "unjust and unreasonable" charges are unlawful.[68] The statutory scheme further provides that if the FCC finds a carrier's tariffs to be "unjust and unreasonable," it is "authorized and empowered to determine and prescribe" just and reasonable rates itself.[69] Of course, it goes without saying that the FCC cannot prescribe "unjust or unreasonable" rates. As we pointed out in Nader v. FCC,[70] one of "(t)he essential elements of a valid prescription order (is) . . . a finding that the action taken is just and reasonable."[71]
 
 
 63
 What we have here, despite the FCC's rhetoric, is a situation where it could not, according to its own judgment, decide whether the proposed tariffs were just and reasonable or unjust and unreasonable. Moreover, the FCC frankly conceded that since it did not have the data at hand to decide what the just and reasonable rates should be, it could not prescribe an appropriate WATS tariff for AT&T. Nonetheless, MCI argues that the action of the FCC in allowing AT&T's WATS tariff revisions to go into and continue in effect amounts to a prescription without the requisite finding that those revisions are just and reasonable.[72] This must be so because, MCI says, the FCC's 1976 decision in so many words finds the proposed rates unlawful, even though the FCC also concluded that "the record is . . . insufficient to permit us to justify any rate structure or rate prescription, even for an interim period."[73]
 
 
 64
 It is indeed true that it is the actual impact of the FCC's actions, rather than the language it uses, which determines whether or not the FCC has "prescribed" tariffs or other conditions under the statute. In Nader v. FCC,[74] for example, the FCC's setting of a specific rate of return was held to be an implicit prescription of permissible charges, because setting an allowable rate of return effectively, even if not literally, mandates what charges can be assessed.[75] And the Second Circuit's 1973 opinion in American Telephone & Telegraph Co. v. FCC[76] held that an FCC requirement for special permission to change a filed rate had "the same effect" as a rate prescription under the statute.[77] But we are unable to find a prescription here.
 
 
 65
 The basic thrust of the FCC's 1976 decision was that "the record is insufficient to support" AT&T's 1973 to 1976 WATS tariff revisions.[78] An indication of the FCC's principal concern comes from its explanation of the need for more data on the differences, if any, in Outward and Inward WATS costs based on the distances involved:[79]
 
 
 66
 . . . By requiring such data, we are not implying that it may not be appropriate to vary Outward and Inward WATS charges over distance. Our finding merely reflects the necessity for having sufficient evidence provided so we can give reasoned consideration to the lawfulness of WATS charges.
 
 
 67
 We conclude that a filed tariff, like those here, not found by the FCC to be either just and reasonable or unjust and unreasonable on the basis of the carrier's supporting evidence at the point of filing can avoid the stigma of unlawfulness, at least for a reasonable time. There must be enough movement in the statutory joints to allow for such an exigency, given the enormous complexity of ratemaking for an enterprise of AT&T's dimensions. Conversely, had we read the FCC's 1976 decision as actually finding AT&T's 1973 to 1976 WATS tariff revisions "unjust and unreasonable" on their merits, we conclude that the prohibition of unjust and unreasonable tariffs in § 201(b) of the statute would prevent the FCC from continuing those revisions in effect. The only exception to that we can see is that perhaps the FCC could continue the unlawful tariffs for a short period to allow the carrier to quickly develop an interim alternative; that would enable the FCC to prevent the complete cessation of vital communication services admittedly a valid goal because of the carrier's failure to then have an effective tariff on file, as § 203(c) of the statute requires.
 
 
 68
 In United States v. Students Challenging Regulatory Agency Procedures (SCRAP),[80] the Supreme Court interpreted provisions of the Interstate Commerce Act similar to those in § 204(a)[81] and found that the Interstate Commerce Commission's (ICC's) limited suspension power analogous to the FCC's authority here "represents a careful accommodation of the various interests involved."[82] The Court thus held that the judiciary cannot enjoin the effectiveness of railroad-initiated transportation surcharges for alleged violations of the National Environmental Policy Act (NEPA) after the ICC had already acted and refused to suspend the surcharges. The Court remarked on the statutory suspension provisions at issue there:[83]
 
 
 69
 . . . The suspension period was limited as to time to prevent excessive harm to the carriers, for the revenues lost during that period could not be recouped from the shippers. On the other hand, Congress was aware that if the Commission did not act within the suspension period, then the new rates would automatically go into effect and the shippers would have to pay increased rates that might eventually be found unlawful. To mitigate this loss, Congress authorized the Commission to require the carriers to keep detailed accounts and eventually to repay the increased rates if found unlawful. To allow judicial suspension for non-compliance with NEPA would disturb this balance of interests.
 
 
 70
 The Court's holding thus amplified its 1963 decision in Arrow Transportation Co. v. Southern Railway Co.[84] that a district court could not delay the effectiveness of new rail carrier rates once the maximum statutory suspension period expired, because that would upset the compromise between the interests of the carriers and those of the public which Congress meant to strike by limiting the ICC's suspension power.[85]
 
 
 71
 More recently in its 1973 American Telephone & Telegraph Co. v. FCC[86] opinion the Second Circuit discussed SCRAP and Arrow Transportation as they apply to what is now § 204(a) of the Communications Act and concluded:[87]
 
 
 72
 Thus, in both SCRAP and Arrow, while the issue was the judiciary's role in the rate making process, the Court recognized the careful accommodation of interests upon which the regulatory scheme was based, including the limitation as to time imposed upon the suspension power granted to the ICC.
 
 
 73
 In light of the Supreme Court's interpretation of analogous provisions of the Interstate Commerce Act, it is abundantly clear to us that the statutory scheme of the Communications Act reflects the realization of Congress that when a carrier is prevented from placing in effect new rate increases it may suffer irreparable loss which in turn may impede the provision of adequate service during a period of rising costs.
 
 
 74
 At issue in SCRAP, Arrow Transportation and in the Second Circuit's 1973 AT&T case were rate increases. AT&T's WATS tariff revisions challenged here resulted in rate increases for some customers, but they also included rate decreases for others,[88] and it is those decreases MCI challenges as anticompetitive. In its opinion, the Second Circuit alluded to rate reductions and § 204(a), and remarked: "Similarly, the loss sustained when an agency delays a rate reduction can be equally as damaging, for during the delay customers may turn elsewhere and be permanently lost to the carrier."[89]
 
 
 75
 The mandate in § 204(a) that carrier-initiated tariff revisions "shall go into effect" at the latest after a five-month suspension, if the FCC has not found them unjust and unreasonable, and the accommodation of competing interests § 204(a) attempts to make, do not, however, still our deeper problems with the length of time these "temporary" or interim WATS tariff revisions have been allowed to remain in effect. We agree with Commissioner Washburn's observation in his reluctant concurrence with the FCC's 1976 decision to continue the revisions' effectiveness that, unless an end comes soon to this proceeding, it will be apparent to all that the FCC "has essentially lost control over the rates (AT&T) . . . charges customers."[90]
 
 
 76
 C. The Standard Applicable to Delays in FCC Decisionmaking
 
 
 77
 In our view, the entire ratemaking procedure in the 1934 Communications Act revolves around a "rule of reason" as to how long the FCC may take between the filing of tariff revisions and its final decision. It assumes that rates will be finally decided within a reasonable time encompassing months, occasionally a year or two, but not several years or a decade. The standard of "just and reasonable" rates is subverted when the delay continues for several years. Ratemaking theories may change; new information may become relevant; one proceeding may have to take account of another. But there must be some reasonably prompt decisionmaking point at which the FCC says: "To the best of our knowledge and expertise at this time, the rates are just and reasonable. Perfect, perhaps not, but just and reasonable, yes." That is all the statute requires.
 
 
 78
 Complex regulation must still be credible regulation; the delay at issue here threatens the FCC's credibility and has frustrated AT&T, its competitors, consumers, FCC Commissioners and this court.[91] Many of the same considerations that impel judicial protection of the right to a "speedy trial" in criminal cases[92] or implementation of civil decrees with all deliberate speed[93] are not inapposite in agency deliberations.[94] Those situations generally involve protection of constitutional rights, but delay in the resolution of administrative proceedings can also deprive regulated entities, their competitors or the public of rights and economic opportunities without the due process the Constitution requires.[95]
 
 
 79
 The best must not become the enemy of the good, as it does when the FCC delays making any determination while pursuing the perfect tariff. If past experience is any guide, the FCC can confidently count on another opportunity soon to finetune its decisionmaking when AT&T proposes still newer WATS tariff revisions. It corrupts the statutory scheme to keep in place, for several years, rates the FCC cannot, or perhaps more pertinently will not, deign to call just or unjust, reasonable or unreasonable.
 
 
 80
 The overwhelming importance of reasonably prompt tariff decisionmaking is underscored here by the lack of appropriate alternatives for MCI. It cannot participate in any refund for injured consumers under § 204(a). Other remedies appear inappropriate, except perhaps allowing MCI to purchase WATS for resale, or otherwise requiring AT&T to share WATS.
 
 
 81
 The statute prohibits discrimination in rates and services among customers,[96] thus the denial of MCI's request to prevent AT&T's further expansion of WATS until a final decision is made on lawful rates seems justified on the ground that to do so would unlawfully discriminate among early and late customers; those having previous access to WATS would be preferred over later potential users.[97] Similarly, the FCC's refusal to require AT&T to refile a pre-1974 (or earlier) tariff which was lawful then only because it was not found unlawful, was no abuse of discretion. That remedy is both highly impractical and foreclosed by the mandate of § 205(a)[98] that an FCC rate prescription must be affirmatively found to be "just and reasonable." Nader v. FCC, supra.
 
 
 82
 D. The Purchase for Resale, or Sharing, of WATS
 
 
 83
 In its 1976 WATS decision the FCC did not address whether WATS should be subject to purchase for resale or sharing, because that issue was the focus of another proceeding.[99] Shortly thereafter, in a separate decision, the FCC found unjust and unreasonable carriers' tariffs prohibiting the purchase for resale or the sharing of private line services.[100] In that decision the FCC recognized that outlawing such prohibitions "might lead to a further equalization of service and rates between large and small communication users."[101] The FCC refused to extend that determination to tariffs prohibiting the purchase for resale or sharing of WATS, however, on the ground that it "might result in a significant shift of MTS users to the WATS offering."[102] The FCC explained:[103]
 
 
 84
 . . . This shift would decrease MTS revenues, possibly requiring a rate increase for MTS, and might lead to an adverse impact on the revenue requirements for intrastate service as a result of changes in the separations data. Moreover, both MTS and WATS are switched services, with characteristics distinct from those of private line service, and we are not prepared to warrant that removal of the restrictions on WATS would lead to the benefits which we foresee for private line service (see paragraphs 75-88, infra ). Accordingly, we will not require removal of the restrictions on sharing and resale of WATS. In view of this action, we are not reviewing AT&T's present practices under and interpretation of its MTS and WATS tariffs.
 
 
 85
 That decision was affirmed "in all respects" by the Second Circuit,[104] but the treatment of WATS in the FCC's opinion was apparently not an issue raised in the petition for review before that court.
 
 
 86
 In its 1977 WATS opinion the FCC noted that specialized carriers such as MCI have repeatedly been authorized to provide only private line services and reaffirmed its decision not to require the resale of WATS (subject to the possibility of later reconsideration).[105] The mere fact that resale has not been allowed in the past, however, is not a reasoned explanation for not allowing it now.
 
 
 87
 The FCC viewed allowing resale or sharing of private line services as principally promoting customer cost savings. That same rationale may be applicable to the resale or sharing of WATS. Indeed, the FCC's 1976 determination not to allow the resale or sharing of WATS because that would cause greater use of it and less of MTS seems outdated in view of the FCC's 1978 determination that WATS and MTS are "like" communication services between which carriers may not discriminate in rates and practices without justification. If they are similar services, and if rates for them must be the same (or, if different, justified on the basis of differences in service or other considerations), then the possibility of an increase or decrease in the usage of one or the other seems perhaps irrelevant.
 
 
 88
 On July 27, 1979, MCI petitioned the FCC to begin a proceeding designed to consider the propriety of the current tariff restrictions on sales for resale and shared use of common carrier communication services, including WATS. On February 25, 1980 the FCC issued a broad notice of proposed rulemaking on that question and related issues.[106] It seems that a WATS sale for resale requirement or the sharing of WATS might well alleviate some of the alleged noncompetitive aspects about the tariffs now in effect. But we leave resolution of that question initially to the FCC.
 
 IV. THE REMEDY HERE
 
 89
 We come finally to the question of what this court can legitimately do to catalyze the FCC's proceedings. Fortunately we have some precedent. Almost thirty years ago in ABC v. FCC[107] this court confronted circumstances hauntingly similar to those now before us when it found unreasonable an FCC delay of almost ten years in the final resolution of the award of a broadcast frequency.
 
 
 90
 In 1941 the FCC issued a "special service authorization" i. e., a temporary license for a certain frequency to a station operator and rebuffed objections from another licensee. The other licensee was using the same frequency pursuant to an earlier "clear channel" license granting it the right to operate on that frequency without interference. After hearings were held, the FCC began a comprehensive investigation of all "clear channel" licenses and refused to resolve the controversy before it regarding the frequency at issue in the ABC case until the "clear channel" proceeding was resolved. This court rejected the FCC's rationale for the delay:[108]
 
 
 91
 Turning to the question whether the proceedings before the Commission on the two authorizations now here on appeal satisfy the requirements of section 312(b), we must answer that question in the negative. There comes a point when what has been designated a "temporary measure" lasts for so long, and shows so little sign of being terminated in the foreseeable future, that to continue to categorize it as "temporary" is to ignore the realities of the situation. A license itself, under the Act, can only be granted for three years duration. Thus, the special service authorizations here in question have lasted for almost three times the term of the modifying license which was held invalid in the KOA case.
 
 
 92
 We cannot agree that the Commission can maintain the status quo indefinitely and in effect semi-permanently by offering the argument that the ultimate determination of KOB's status must depend upon the outcome of the clear channel proceedings. It is true that those proceedings may ultimately lead to very different conclusions regarding KOB than those which might be reached in this case. And that in turn might result in KOB having to incur additional expenses and frequency changes. But even if this would have been a valid argument in 1945, when the clear channel proceedings were first commenced, it cannot be controlling now. Until that time delay had been due primarily to the war, and all parties had acquiesced. Further, it then appeared that the clear channel proceedings would be disposed of promptly. But that is not the situation now before us. The Commission has made no showing of even a reasonable possibility that the clear channel proceedings will be completed shortly. And apparently it has conducted no further tests to determine where KOB should be located. WJZ has thus been required to bear a large part of the loss resultant from the original NARBA treaty arrangement eliminating frequency 1180. Interference caused by the operation of KOB causes the loss of approximately 23,000,000 possible listeners to WJZ. The Commission has in effect permitted this substantial loss to occur and to continue.
 
 
 93
 Invoking its general equity powers, the ABC court remanded to the FCC, noting "we can direct the Commission to exercise its discretion in accordance with law."[109]
 
 
 94
 Nader v. FCC,[110] also in this court involved a similar situation of several years delay by the FCC in settling a rate controversy between the same parties at issue here. There this court said:[111]
 
 
 95
 We are sympathetic with MCI's characterization of Docket 18128 as "an interminable proceeding, the principal function of which has been that of a giant regulatory wastebasket." MCI's Reply Br. at 8. Though unwilling to impute ill motives to the Commission, we are constrained to agree with MCI on the following point:
 
 
 96
 nine years should be enough time for any agency to decide almost any issue. There comes a point when relegating issues to proceedings that go on without conclusion in any kind of reasonable time frame is tantamount to refusing to address the issues at all and the result is a denial of justice.
 
 
 97
 The court noted several "harmful effects" from the FCC's "dilatory pace."[112]
 
 
 98
 . . . Until it rules on the lawfulness of a rate, its sole remedial power is to subject the filed tariff to an accounting and refund order. While there is much merit to this procedure, it is far from perfect. First, it does not protect specialized carriers from the discriminatory tactics that they claim AT&T is using. If the Commission ultimately determines that Bell's MTS rates are too high and the private line rates too low, MTS users will receive a refund, but AT&T's competitors will not be compensated for loss of business. Second, if at some future date a refund is ordered, its magnitude could be staggering. To date, AT&T has well over one billion dollars of revenue subject to accounting and refund, and this figure grows at the rate of four hundred million annually. Finally, the present inflationary trend is causing regulated industries to seek rate revisions more frequently than in the past AT&T sought and received interim increases in 1970, 1972, and in February of this year. The Commission's inability to determine the lawfulness vel non of these increases within a reasonable time suggests that it verges on losing its ability to effectively regulate at all.
 
 
 99
 Calling upon our authority under § 10(e) of the Administrative Procedure Act (APA) to "compel agency action unlawfully withheld or unreasonably delayed,"[113] the Nader court required the FCC to file with the court in 30 days a schedule for completion of the rate proceedings.[114] The court retained jurisdiction to approve the schedule and required prior court permission before that schedule could later be changed. That procedure appeared in the Nader case to produce results; although the schedule agreed upon inevitably encountered some slippage, the FCC apparently issued a final decision within 17 months. We are inclined to try that alternative again.
 
 
 100
 We are aware in so doing that the task is complicated, that the FCC has set and reset many schedules of its own for these proceedings over the years, and that delays have resulted from new thinking, new methodologies, new theories of rate evaluation and from the inception of related proceedings which must be coordinated with this one. Nevertheless, we believe the time has come to bring these proceedings to a close, and a judicially supervised schedule for doing that hopefully will obviate the need for more drastic judicial relief. Therefore, we will not now act on MCI's petition for review of the FCC's 1977 and 1978 WATS decisions, but we remand to the FCC to recommend to us 30 days from today a feasible schedule for final determination of a just and reasonable WATS tariff in this proceeding. That schedule shall discuss the FCC's estimated timetable for disposing of any other current or proposed FCC proceedings having a substantial impact on the resolution of this matter. Any party to the proceedings before the FCC[115] or now before the court shall file with the court any comments on the FCC's proposed schedule within fifteen days after that schedule is filed with the court by the FCC. Within fifteen additional days, the FCC may reply to any of the comments. The court will then either approve, reject, or appropriately modify the schedule, or make such further orders as necessary.
 
 
 101
 After a schedule has been approved, the parties will be expected to adhere to it. Deviations from the schedule will require the court's prior approval.[116] This division of the court shall retain jurisdiction "to ensure compliance"[117] with our decision.
 
 
 102
 IT IS SO ORDERED.
 
 
 
 *
 At the time the brief was filed
 
 
 **
 Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976)
 
 
 [1]
 American Tel. & Tel. Co. (Long Lines Dept.), 66 F.C.C.2d 9 (1977)
 
 
 [2]
 American Tel. & Tel. Co. (Long Lines Dept.), 69 F.C.C.2d 1672 (1978)
 
 
 [3]
 American Tel. & Tel. Co. (Long Lines Dept.), 59 F.C.C.2d 671 (1976)
 
 
 [4]
 The petitioners are MCI Telecommunications Corporation, Microwave Communications, Inc., and N-Triple-C Inc. Intervenor Southern Pacific Communications Company joined in the petitioners' briefs
 
 
 [5]
 The 1934 Act, as amended, provides in part:
 (a) It shall be the duty of every common carrier engaged in interstate or foreign communications by wire or radio to furnish such communications service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.
 (b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest.
 47 U.S.C. § 201(a) & (b) (1976).
 
 
 [6]
 See Revisions of FDC Costing Methodologies Subsequent to Docket No. 18128, 66 F.C.C.2d 914, 915 (1977) (statement of Commissioner Washburn); see also text at notes 23-25, infra
 
 
 [7]
 Outward WATS enables a subscriber to place long-distance telephone calls within a designated geographical area during specified periods of time for less than standard long-distance rates. Many businesses utilize outward WATS for frequent calls to customers, clients and employees in other cities
 
 
 [8]
 Inward WATS enables a subscriber to receive long-distance telephone calls, again from a specific area and during set times, without the caller being charged. That service is used by companies to induce customers to place orders for products, make reservations and obtain information; it is characterized commonly as the service involving "800" numbers, referring to the first three digits a customer dials to obtain access to the service
 
 
 [9]
 That acronym is the shorthand for "Message Telecommunications Service," the FCC's name for standard long-distance telephone service
 
 
 [10]
 See 26 Fed.Reg. 378 (1961)
 
 
 [11]
 American Tel. & Tel. Co., 37 F.C.C. 688, 695 & 704 (1964). The FCC described the areas it concluded needed study as follows:
 a. The overall level of WATS rates appears to be productive of sufficient revenue to recover the costs incurred in furnishing the service and to be fully compensatory. However, as discussed in paragraph 30, A.T.&T.'s estimates with respect to its cost savings and operating results expected from the WATS service require further testing in light of the substantial usage experience now available, particularly to determine the effects of the WATS offering on peak-hour traffic and whether stimulation resulting from either the full-time or measured-time service has caused additional usage with resultant increases in cost.
 b. As developed in paragraphs 32-36, further examination is required of the relationship between WATS rates for full-time and measured-time service to ascertain, in light of current usage of WATS, whether the measured-time users are bearing a disproportionate share of the costs incurred in furnishing the WATS service and whether current revenue requirements applicable to the total service are being met.
 c. As developed in paragraph 37, it does not appear from this record that there is need for a full-time class of WATS service, and a question is raised as to why all service should not be priced on a measured-time basis, with the appropriate full-time rate being established as the maximum charge regardless of usage.
 d. As developed in paragraph 41, consideration should be given to the feasibility and economic justification of extending the measured-time features of the WATS offering so as to make it available to customers who have a usage requirement of less than 15 hours' monthly service.
 Id. at 701 & 704.
 
 
 [12]
 American Tel. & Co., 38 F.C.C. 475, 476 (1965)
 
 
 [13]
 American Tel. & Tel. Co., 21 F.C.C.2d 495, 496-97 (1970)
 
 
 [14]
 American Tel. & Tel. Co., 38 F.C.C.2d 213 (1972)
 
 
 [15]
 American Tel. & Tel. Co., 38 F.C.C.2d 984, 987 (1973), aff'd sub nom. Nader v. FCC, 520 F.2d 182 (D.C.Cir.1975). The statute relating to the possibility of refunds provides that:
 . . . in case of a proposed charge for a new service or an increased charge, the Commission may by order require the interested carrier or carriers to keep accurate account of all amounts received by reason of such charge for a new service or increased charges, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such charge for a new service or increased charges as by its decision shall be found not justified.
 47 U.S.C. § 204(a) (1976).
 
 
 [16]
 38 F.C.C.2d at 986
 
 
 [17]
 American Tel. & Tel. Co. (Long Lines Dept.), 46 F.C.C.2d 81, 84 (1974)
 
 
 [18]
 American Tel. & Tel. Co., 51 F.C.C.2d 619, 626 (1975)
 
 
 [19]
 American Tel. & Tel. Co., 58 F.C.C.2d 1 (1976)
 
 
 [20]
 59 F.C.C.2d at 703
 
 
 [21]
 Id. at 715-16 (footnote omitted)
 
 
 [22]
 69 F.C.C.2d at 1676 n. 5; 59 F.C.C.2d at 673
 
 
 [23]
 American Tel. & Tel. Co. (Long Lines Dept.), 61 F.C.C.2d 587 (1976)
 
 
 [24]
 American Tel. & Tel. Co. (Long Lines Dept.), 64 F.C.C.2d 971 (1977); American Tel. & Tel. Co. (Long Lines Dept.), 67 F.C.C.2d 1441 (1978)
 
 
 [25]
 Aeronautical Radio, Inc. v. FCC, No. 77-1333 (D.C.Cir.). We obviously intimate no views on the issues presented in that case
 
 
 [26]
 American Tel. & Tel. Co., 62 F.C.C.2d 771 (1976)
 
 
 [27]
 The 1977 revisions extended WATS to Hawaii and Alaska for the first time, as well as amending the tariffs applicable to WATS in the continental United States
 
 
 [28]
 The statute provides in pertinent part that "(i)t shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device . . . ." 47 U.S.C. § 202(a) (1976)
 
 
 [29]
 The FCC's concerns were as follows:
 Turning first to Outward WATS service vis-a-vis MTS Direct Distance Dialing (DDD), the showing made in this filing is insufficient to convince us that Outward WATS and MTS are not "like services," in which case any difference in rates must be justified under Section 202(a) of the Act. Besides the differences between the services enumerated above, there are many significant similarities. For example, the same technology is used to provide both MTS DDD and Outward WATS services and once an MTS or Outward WATS call enters the network, they are indistinguishable. Cf. DDS, 62 FFC 2d at 796. Indeed, when Outward WATS and MTS services are used in conjunction with a "WATS box," i. e., arranged in rotary such that the "box" chooses between WATS and MTS lines on the basis of availability or economy no difference exists between the two services except rates. Moreover, it appears that the primary basis for customer preference for WATS appears to be the substantial cost savings which results from the lower unit tariff charge for Outward WATS calls. CF, DDS, 62 FCC 2d at 796. The formal pleadings, comments and letters received from WATS subscribers repeatedly emphasize the cost savings they obtain from WATS services vis-a-vis MTS and other services, and that this fact initially induced them to secure outward WATS to replace some of their MTS lines. Further, the WATS business market studies submitted in this filing demonstrate that the primary reason given by customers for starting WATS services is economy in the customer's total communications bill. See Volume 51 of Justification, pp. 2-24 and 2-25. This is also shown in this filing by the cross-elasticity between MTS and Outward WATS which is described as "pronounced."
 
 
 [66]
 F.C.C.2d at 30-31
 
 
 [30]
 Id. at 22
 
 
 [31]
 The ten deficiencies were as follows:
 (1) It failed to justify WATS services and rates either separately or as bulk rate MTS offerings as required by the Docket No. 19989 Decision, see para. 50 above;
 (2) It utilized essentially the same "alignment" approach to justify WATS services and rates which was rejected by the Commission in Docket No. 19989, see para. 50 above;
 (3) The documentation for the LRIC studies submitted fails to comply with requirements of the Docket No. 19989 Decision, see paras. 56-59 above;
 (4) The FDC cost data is either out of date or "trended" forward without required new cost studies in contravention of filing requirements in the Docket No. 19989 Decision, see paras. 61-62 above;
 (5) It fails to justify WATS cost figures and rates by length of haul as required by the Docket No. 19989 Decision, see para. 62 above;
 (6) The forecasting methodologies, and justification therefor, supplied in the filing to show market effects of the WATS tariff changes do not comply with the Docket No. 19989 Decision, see paras. 65-82 above;
 (7) It includes no justification for the admitted cross-subsidization between Outward and Inward WATS services except by a "value of service" argument which on its face does not comply with the Docket No. 19989 Decision, see para. 51 above;
 (8) It fails to include cost studies of the effects of WATS services on peak hour usage of the public switched network and does not show that WATS rate structures encourage efficient use of the network in violation of our Docket No. 19989 Decision, see paras. 87-94 above;
 (9) It includes no FDC cost studies by service subclasses under the proposed tapered WATS rate structures as required in the Docket No. 19989 Decision, see para. 64 above; and
 (10) To the extent the filing departs from cost-based pricing, it does not provide the Commission a bench-mark to measure the departure herein from cost-based pricing. This violates the Docket No. 19989 Decision, see para. 51 above.
 Id. at 60-61. The FCC, however, upheld the tariff revisions which initiated WATS in Hawaii and Alaska.
 
 
 [32]
 The nine ways were described by the FCC:
 (1) The ratemaking approach used in the filing is the same "basic service philosophy" rejected by the Commission in Docket No. 18128, see paras. 95-97 above;
 (2) The FDC cost data supplied is either out of date or "trended" forward without required new cost studies in violation of filing requirements in the Docket No. 18128 Decision, see paras. 61-62 above;
 (3) To the extent that the filing arbitrarily aggregates MTS and WATS services into one class of service and asks us to regulate such services as one monopoly service, it violates Docket No. 18128 which requires consistent treatment of all Bell services with respect to cost allocation, permissible returns, and the determination and proscription of cross-subsidization, see paras. 98-99 above;
 (4) The FDC cost studies provided herein are deficient and violate our Decision in Docket No. 18128 because no single methodology is used consistently, see paras. 100-104 above;
 (5) The new WATS rates and rate structure are based on the same LRIC cost methodology rejected in Docket No. 18128, see paras. 56-59 above;
 (6) The filing violates the basic policies, findings, principles and guidelines adopted in the Docket No. 18128 Decision which holds that disparate and incongruous ratemaking concepts are unlawful, see para. 98 above;
 (7) There is in the filing no justification for the admitted cross-subsidization between Outward and Inward WATS services except by a "value of service" argument which on its face does not comply with the Decision in Docket No. 18128, see para. 51 above;
 (8) The filing fails to meet the explicit requirements of the Docket No. 18128 Decision pertaining to the filing of documentation for waiver requests, see paras. 105-08 above; and
 (9) The proposed WATS tariffs are based upon the same return levels already found "clearly excessive" in Docket No. 18128, see paras. 109-110 above.
 Id. at 61-62.
 
 
 [33]
 Id. at 62
 
 
 [34]
 The FCC's rationale was as follows:
 Finally, with respect to MCI's allegations that the WATS tariff filing is "predatory" and "anticompetitive" we agree with AT&T that MCI's allegations in this regard are conclusionary and lack specificity. Thus, we see no need to address MCI's allegations and all of its suggested hearing issues set forth at para. 24 herein. However, we recognize that WATS services, as business services, may be cross-elastic with both Bell and specialized common carrier private line services. Since cross-elasticities between and among services are generally directly related to both the rate structure and rate levels chosen, and may therefore be subject to some degree of manipulation, the level of any cross-elastic effect is an indicator in some instances of competitive impact, which, depending on the extent and nature thereof, may justify remedial Commission action. Our statutory responsibilities require us to consider as part of the public interest standard the antitrust laws and to ensure just, reasonable, and otherwise lawful rates under Sections 201(b) and 202(a) of the Act. Thus, we are prepared to, and indeed must, consider the competitive and other public interest implications arising from WATS tariff changes. We wish to stress that our prior references to WATS services as "monopoly" services mean that AT&T and the independent telephone companies are the only carriers presently authorized to offer such interstate services. We do not mean to imply that WATS services and rates therefor are in some manner "protected" from Sections 201(b) and 202(a) of the Act and all that is encompassed in the public interest standard. When Bell refiles WATS tariff revisions in compliance with this Decision we shall examine them consistent with the views stated herein.
 Id. at 56-57 (footnote omitted).
 
 
 [35]
 Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities, 60 F.C.C.2d 261, 290-91 (1976), aff'd on other grounds sub nom. American Tel. & Tel. Co. v. FCC, 572 F.2d 17 (2d Cir.), cert. denied, 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1977)
 
 
 [36]
 The FCC's complete discussion of this point was:
 Resale Sharing of WATS Services and Competition. As set forth at paras. 23-26 above, MCI alleges that AT&T's WATS tariff filing and WATS services themselves are "predatory" and "anticompetitive." Basically, it seeks Commission action either ordering AT&T to cease providing WATS services, or action permitting MCI and other specialized carriers to provide WATS-like services. If it cannot provide WATS-like services, and AT&T continues to offer WATS services, MCI requests that resale and sharing of WATS services be permitted. Underlying MCI's position is its belief that because it and other specialized carriers are not permitted by the Commission's Execunet, SPLS, and SPRINT Decisions, supra, to use common terminating, switching, and distribution facilities of the public switched network in connection with their private line services, neither should AT&T be permitted to do so in conjunction with its WATS services.
 . . . MCI's position is without merit. AT&T has sought and is authorized to provide MTS and WATS services in addition to its private line services, but the Commission has held repeatedly that specialized common carriers, such as MCI, are authorized to provide only private line services. See Specialized Common Carrier, Execunet, SPLS, and SPRINT Decisions, supra. With respect to MCI's request for resale and sharing of WATS services, in our Final Decision in the Resale and Shared Use Inquiry, supra, 60 FCC 2d at 290, we declined to order resale and sharing of WATS services. Although we may reconsider this determination at a later date in a separate proceeding, we are not prepared to do so in the context of this particular tariff filing which we are rejecting in any event.
 
 
 [66]
 F.C.C.2d at 56
 
 
 [37]
 Id. at 63 n. 75
 
 
 [38]
 Id. at 63
 
 
 [39]
 Id. at 64
 
 
 [40]
 Id
 
 
 [41]
 69 F.C.C.2d at 1676 (footnote omitted)
 
 
 [42]
 Id
 
 
 [43]
 American Tel. & Tel. Co., 70 F.C.C.2d 593 (1978), reconsideration pending
 
 
 [44]
 69 F.C.C.2d at 1690
 
 
 [45]
 Id. at 1686. As the FCC explained:
 For example, we would be concerned if WATS rate structures operated to negate or suppress potentially efficient network usage patterns caused by MTS rate structures, or, on the other hand, if MTS rate structures negated or suppressed efficient network usage resulting from WATS rate structures. It was these central concerns and goals which we expected the WATS filing to incorporate or, in the alternative, to at least demonstrate a major effort towards developing studies and proposals to achieve our regulatory ends. This it did not do. Therefore, the next tariff filing must rectify these omissions.
 
 
 [46]
 Id. at 1691 (citation omitted)
 
 
 [47]
 Id. (footnote omitted)
 
 
 [48]
 Id. at 1693
 
 
 [49]
 Neither AT&T's proposals nor the comments of interested parties are before us
 
 
 [50]
 On July 27, 1979 MCI renewed its request that the FCC require AT&T to sell WATS time to MCI for resale. See text at notes 106-13, infra
 
 
 [51]
 See 66 F.C.C.2d at 20
 
 
 [52]
 MCI candidly admits it would be better off if AT&T's pre-1974 (or earlier) WATS tariffs were reinstated but does not further explain how it would benefit. Intervenors Aeronautical Radio, Inc., and the Air Transport Association assert that AT&T's 1974 WATS tariff revisions (which are the revisions MCI principally attacks) increased WATS rates for short distances and decreased them for longer transmissions, resulting in rate increases for about 40 percent of the WATS customers and decreases for about 60 percent. AT&T presented similar figures to the FCC. See 59 F.C.C.2d at 676. The exact effect of the revisions at issue here, however, is immaterial to our decision
 
 
 [53]
 MCI Br. 24
 
 
 [54]
 Section 204(a) of the statute provides:
 (a) Whenever there is filed with the Commission any new or revised charge, classification, regulation, or practice, the Commission may either upon complaint or upon its own initiative without complaint, upon reasonable notice, enter upon a hearing concerning the lawfulness therefore; and pending such hearing and the decision thereon the Commission, upon delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such charge, classification, regulation, or practice, in whole or in part but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearing the Commission may make such order with reference thereto as would be proper in a proceeding initiated after such charge, classification, regulation, or practice had become effective. If the proceeding has not been concluded and an order made within the period of the suspension, the proposed new or revised charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed charge for a new service or an increased charge, the Commission may by order require the interested carrier or carriers to keep accurate account of all amounts received by reason of such charge for a new service or increased charge, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such charge for a new service or increased charges as by its decision shall be found not justified. At any hearing involving a charge increased, or sought to be increased, the burden of proof to show that the increased charge, or proposed charge, is just and reasonable shall be upon the carrier, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible.
 47 U.S.C. § 204(a) (1976).
 
 
 [55]
 Section 203(a) of the statute prohibits collecting charges for, and otherwise providing communication services by wire or radio unless a description of those charges and services is on file with the FCC. The notice provision in § 203(b)(1) provides:
 No change shall be made in the charges, classifications, regulations, or practices which have been so filed (i. e., pursuant to § 203(a)) and published except after ninety days notice to the Commission and to the public, which shall be published in such form and contain such information as the Commission may by regulations provide.
 47 U.S.C. § 203(b)(1) (1976).
 
 
 [56]
 Id. § 204(a)
 
 
 [57]
 Id. § 204(b)
 
 
 [58]
 Recommendation No. 72-4, Suspension and Negotiation of Rate Proposals by Federal Regulatory Agencies, reprinted in 2 Recommendations and Reports of the Administrative Conference of the United States 64 (1970-72)
 
 
 [59]
 Id. at 62-63
 
 
 [60]
 S. Rep. No. 918, 94th Cong., 2d Sess. 4 (1976)
 
 
 [61]
 47 U.S.C. § 204(a) (1976)
 
 
 [62]
 Id. § 204(b)
 
 
 [63]
 Id. § 204(a)
 
 
 [64]
 Id. § 204(b)
 
 
 [65]
 See text at note 58 supra
 
 
 [66]
 On three separate occasions in the opening paragraph of its 1976 decision the FCC describes AT&T's 1973 to 1976 WATS tariff revisions as "unjustified and therefore unlawful." 59 F.C.C.2d at 672. The FCC further found that AT& T's "alignment" rate setting approach "results in unjustified discriminations in favor of long-haul WATS users vis-a-vis short-haul WATS users," id. at 677, that it results in "patent illegality" and that it is "unjustified and unacceptable for other reasons." Id. at 678. In the conclusions to its 1976 decision, the FCC notes that AT&T's "alignment" approach "is unacceptable and violative of clearly established Commission policy" and concludes that AT& T's 1974, 1975 and 1976 WATS tariff revisions are "unjustified and unlawful." Id. at 703. In explaining its 1976 conclusion to continue the tariffs and its accounting orders in effect for 210 days to prevent the elimination of WATS pending the filing of another tariff, the FCC states that "the WATS tariff has been found unlawful as indicated herein" and that "(a)s indicated above, we have found the foregoing WATS tariff filings unlawful." Id. at 709
 
 
 [67]
 The relevant ordering paragraph of the 1976 decision states:
 
 
 [90]
 Accordingly, IT IS ORDERED, That, pursuant to Section 201(b) and 202(a) of the Act, the tariff schedules filed with Bell Transmittal Nos. 11657 and 11935 (and revisions thereto) are found unlawful as indicated herein, ARE NULL AND VOID, effective 210 days after publication of this Decision in the Federal Register
 Id. at 709-10.
 
 
 [68]
 47 U.S.C. § 201(b) (1976)
 
 
 [69]
 Id. § 205(a). That section of the statute states:
 (a) Whenever, after full opportunity for hearing, upon a complaint or under an order for on its own initiative, the Commission shall be of opinion that any charge, classification, regulation, or practice of any carrier or carriers is or will be in violation of any of the provisions of this Act, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable charge or the maximum or minimum, or maximum and minimum, charge or charges to be thereafter observed, and what classification, regulation, or practice is or will be just, fair and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent that the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any charge other than the charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed.
 Id.
 
 
 [70]
 Note 15, supra
 
 
 [71]
 520 F.2d at 204 (emphasis supplied). Accord, American Tel. & Tel. Co. v. FCC, 487 F.2d 865, 874 (2d Cir. 1973)
 
 
 [72]
 Aeronautical Radio and the Air Transport Association argue that MCI is effectively attacking the FCC's 1976 decision, not its 1977 and 1978 decisions, and that MCI's petition for review is therefore untimely. The FCC joins that argument only if we find that MCI is attacking the FCC's authority to delay implementation of its 1976 decision. FCC Br. 27 n. 26. We view the FCC's 1977 and 1978 decisions as separate and distinct from the one issued in 1976, and we do not interpret MCI's petition as challenging the FCC's authority to continue the effectiveness of tariffs for a reasonable time, pending a final determination as to whether they are just and reasonable and subject to an accounting order for possible future refunds. The FCC's 1977 decision found AT&T's 1977 WATS tariffs filing insufficient; it was not simply a replay of the 1976 decision. The effectiveness of the 1973 to 1976 revisions was continued in the 1977 and 1978 decisions solely because of the perceived deficiencies in AT&T's 1977 filing. We find no timeliness problem here. ABC v. FCC, 191 F.2d 492, 500 (D.C.Cir. 1951)
 
 
 [73]
 59 F.C.C.2d at 708
 
 
 [74]
 Note 15, supra
 
 
 [75]
 520 F.2d at 201-03. This court found that prescription lawful, but there the FCC had effectively made the required "just and reasonable" finding. Id. at 204
 
 
 [76]
 Note 71, supra
 
 
 [77]
 487 F.2d at 874
 
 
 [78]
 59 F.C.C.2d at 708. As the FCC stated in the opening paragraph to its 1976 decision:
 . . . Our major conclusion is that Bell has failed to carry its burden of showing that the (WATS rates resulting from AT&T's 1973 to 1976 tariff revisions) . . . are just, reasonable and free of unlawful discrimination within the meaning of Sections 201(b) and 202(a) of the Act.
 Id. at 672. In discussing AT&T's "alignment" approach, the FCC stated "support for Bell's justification for its ratemaking approach is either nonexistent in this record or where presented is unexplained," id. at 677, and that "the lawfulness of such charges has not been shown by Bell." Id. at 678. Throughout the FCC's discussion of AT&T's "alignment" approach are other expressions indicating that it simply has "no record support," not that it is necessarily unlawful e. g., that approach "is based on key assumptions and judgments for which there is no record support," and "Bell's failure to explain or justify" its procedures "is significant." Id. at 678 & 679. The FCC's conclusion was, therefore, that "Bell has not justified 'alignment' in theory, and its mechanical presentation of 'alignment,' assuming arguendo it could be a valid ratemaking approach in general, has not been justified on this record." Id. at 680 (emphasis supplied).
 
 
 [79]
 Id. at 680. In discussing other aspects of AT&T's WATS tariff revisions, the FCC indicated it rejected them for lack of supporting evidence, not necessarily on their merits. E. g., id. at 683 (discussion of "revenue requirement"); id. at 689 (AT&T's failure to classify inward and outward WATS as different services); id. at 690 (validity of incremental and embedded cost justification). In several instances the phrase the FCC used was that the lack of record support prevented it from making "a definitive finding" on the lawfulness of various aspects of AT&T's WATS tariff revisions. Id. at 692, 693 and 694 (non-recurring and other charges); id. at 696 and 698 (usage sensitive pricing changes); id. at 699 (termination requirements). See also id. at 701 & 702
 
 
 [80]
 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)
 
 
 [81]
 The provisions of the Interstate Commerce Act at issue there provided:
 Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, after September 18, 1940, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable, and the Commission shall give to the hearing and decision of such questions preferences over all other questions pending before it and decide the same as speedily as possible.
 49 U.S.C. § 15(7) (1970).
 
 
 [82]
 412 U.S. at 697, 93 S.Ct. at 2421
 
 
 [83]
 Id
 
 
 [84]
 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963)
 
 
 [85]
 The Arrow Transportation Court remarked:
 . . . Congress engaged in a protracted controversy concerning the period for which the Commission might suspend a change of rates. Such a controversy would have been a futile exercise unless the Congress also meant to foreclose judicial power to extend that period. This controversy spanned nearly two decades.
 . . . Congress was aware throughout the consideration of these measures that some shippers might for a time have to pay unlawful rates because a proceeding might not be concluded and an order made within the reduced time. To mitigate that hardship, the 1920 amendments authorized the Commission in such cases to require the carriers to keep detailed accounts of charges collected and to order refunds of excess charges if the Commission ultimately found the rates to be unlawful.
 Id. at 664 and 665-66, 83 S.Ct. at 987-988 (footnotes omitted).
 
 
 [86]
 Note 71, supra
 
 
 [87]
 487 F.2d at 873-74
 
 
 [88]
 Note 52, supra
 
 
 [89]
 487 F.2d at 874 n.18
 
 
 [90]
 See text at note 22, supra
 
 
 [91]
 As Roger C. Cramton wrote in 1972 during his tenure as Chairman of the Administrative Conference of the United States:
 The average citizen is not concerned with the intricacies and details of government. If he needs a two-way radio in his business, he wants it now. If he believes he is entitled to social security or to disability benefits, he does not want to spend months in litigation, mortgaging his prospective income to pay attorneys' fees. The businessman who needs a loan, the broker who wants to sell stock, the manufacturer who bids on a contract, the company that wants to merge, these and thousands of others are entitled to have their claims acted upon promptly and fairly.
 Cramton, Causes and Cures of Administrative Delay, 58 A.B.A.J. 937, 941 (1972).
 
 
 [92]
 Society's interest in avoiding undue delay in criminal trials stems from a general presumption that governmental delay is unfair: "Despite the difficulties of proving, or disproving, actual harm in most cases, it seems that inherent in prosecutorial delay is 'potential substantial prejudice' . . . ." Dickey v. Florida, 398 U.S. 30, 54, 90 S.Ct. 1564, 1577, 26 L.Ed.2d 26 (1970) (Brennan, J., concurring; citation omitted). The right to prompt judicial redress is basic to our system of justice. In Klopfer v. North Carolina, 386 U.S. 213, 223, (87 S.Ct. 988, 993, 18 L.Ed.2d 1) (1967), for example, where the government's delay in the prosecution for criminal trespass of a civil rights demonstrator was found to be unjustified under the Constitution's speedy trial clause, the court noted that the right to quick resolution of controversies "has its roots at the very foundation of our English law heritage. Its first articulation in modern jurisprudence appears to have been made in Magna Carta (1215), wherein it was written, 'We will sell to no man, we will not deny or defer to any man either justice or right' . . . ." (Footnote omitted). Regarding the application of the constitutional speedy trial right at least in quasi-criminal administrative proceedings, see Goldman, Administrative Delay and Judicial Relief, 66 Mich.L.Rev. 1423, 1436-39 (1978)
 
 
 [93]
 In Watson v. Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963), for example, the Court compelled the prompt desegregation of the public parks and other municipal recreational facilities in Memphis because segregation in such places had been held unlawful almost eight years earlier
 . . . In considering the appropriateness of the equitable decree entered below inviting a plan calling for an even longer delay in effecting desegregation, we cannot ignore the passage of a substantial period of time since the original declaration of the manifest unconstitutionality of racial practices such as are here challenged, the repeated and numerous decisions giving notice of such illegality, and the many intervening opportunities heretofore available to attain the equality of treatment which the Fourteenth Amendment commands the States to achieve.
 Id. at 529-30, 83 S.Ct. at 1316-1317 (footnote omitted). Cf. Randall v. Sumter School District Number 2, 232 F.Supp. 786, 788-91 (E.D.S.C.1964) (defense of plaintiff's failure to exhaust administrative remedies rejected because delay and school board's inaction showed remedy "is for naught"). Here a substantial period has elapsed since the FCC's 1976 decision finding AT& T's 1973 to 1976 WATS tariff revisions are not supported by the data AT&T produced, the FCC itself has reiterated its 1976 conclusions in its 1977 and 1978 decisions, and it appears to us that the FCC might have proceeded with greater dispatch.
 
 
 [94]
 Indeed, in Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 619, 64 S.Ct. 1215, 1222, 88 L.Ed. 1488 (1944), the court remanded for an agency interpretation "with all deliberate speed" of a statutory term in the Fair Labor Standards Act so that the protections Congress mandated for workers would not be delayed
 
 
 [95]
 See Smith v. Illinois Bell Tel. Co., 270 U.S. 587, 591, 46 S.Ct. 408, 410, 70 L.Ed. 747 (1926) ("(p)roperty may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them"); White v. Mathews, 434 F.Supp. 1252, 1261 (D.Conn.1976) ("(w)hen the government does not act with reasonable promptness, those claiming (benefits) . . . are required to bear an unreasonable delay and suffer unwarranted deprivation of that which is lawfully theirs"), aff'd, 559 F.2d 852, 858-60 (2d Cir. 1977). See generally, K. Davis, Administrative Law of the Seventies § 8.08 (1976); B. Schwartz, Administrative Law 67-93 (1976); Goldman, supra note 92, at 1434-35
 
 
 [96]
 The statute provides:
 It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.
 47 U.S.C. § 202(a) (1976).
 
 
 [97]
 See text at note 42, supra
 
 
 [98]
 Section 205(a) provides:
 (a) Whenever, after full opportunity for hearing, upon a complaint or under an order for investigation and hearing made by the Commission on its own initiative, the Commission shall be of opinion that any charge, classification, regulation, or practice of any carrier or carriers is or will be in violation of any of the provisions of this chapter, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable charge or the maximum or minimum, or maximum and minimum, charge or charges to be thereafter observed, and what classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent that the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any charge other than the charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed.
 
 
 [99]
 59 F.C.C.2d at 702
 
 
 [100]
 Note 35, supra
 
 
 [101]
 60 F.C.C.2d at 290
 
 
 [102]
 Id
 
 
 [103]
 Id. at 290-91
 
 
 [104]
 American Tel. & Tel. Co. v. FCC, supra, note 35, 572 F.2d at 27
 
 
 [105]
 66 F.C.C.2d at 56
 
 
 [106]
 45 Fed.Reg. 13139 (1980)
 
 
 [107]
 Note 72, supra
 
 
 [108]
 191 F.2d at 500-01
 
 
 [109]
 Id. at 502
 
 
 [110]
 Note 15, supra
 
 
 [111]
 520 F.2d at 206
 
 
 [112]
 Id. at 206-07
 
 
 [113]
 5 U.S.C. § 706(1) (1976). That provision provides in pertinent part:
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall
 (1) compel agency action unlawfully withheld or unreasonably delayed. . . .
 
 
 [114]
 In Deering Milliken, Inc. v. Johnson, 295 F.2d 856 (4th Cir. 1961), the Fourth Circuit used § 10(a) of the APA, now 5 U.S.C. § 702 (1976), to enjoin a regional director of the National Labor Relations Board from proceeding with hearings which the court found would unnecessarily delay final resolution of a labor dispute. The relevant portion of § 10(a) provides:
 A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States.
 Id. (emphasis supplied). See generally, Note, Judicial Acceleration of the Administrative Process: The Right to Relief From Unduly Protracted Proceedings, 72 Yale L.J. 574 (1963). Given this court's reliance on its equity powers in ABC and its use of § 10(e) of the APA in Nader, we need not decide what authority § 10(a) gives us.
 
 
 [115]
 There apparently are parties which appeared in these proceedings before the FCC but are not before the court. The FCC is ordered to give them notice, within ten days of today, of this court's opinion and their right to file comments on the schedule the FCC proposes
 
 
 [116]
 The State of Hawaii as intervenor asks the court not to invalidate those parts of AT&T's tariff revisions which extend WATS to Hawaii (WATS was also extended to Alaska at the same time). Hawaii notes that no one has challenged those revisions. Our opinion today has no effect on the FCC's determination to allow the extension of WATS to Hawaii or Alaska
 
 
 [117]
 Nader v. FCC, supra, note 15, 520 F.2d at 207